*In re* CONFERENCIA JUDICIAL DE PUERTO RICO, SESIÓN ESPECIAL.

*Número:* _____    *Resuelto:* 10 de octubre de 1988

## RESOLUCIÓN

El pasado 14 de abril de 1988 el Tribunal, al acoger las expresiones públicas pronunciadas por el Juez Presidente Señor Pons Núñez por razón de la sustitución del Juez Superior Hon. Guillermo Arbona Lago por el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, expresó su honda preocupación en torno a los serios problemas relativos al contenido real del concepto de independencia judicial dentro de nuestro esquema constitucional de separación de poderes.

En consecuencia, y para tratar ese tema en su más amplia dimensión, en esa misma fecha el Tribunal convocó a una Sesión Especial de la Conferencia Judicial.

*Hoy el Tribunal reitera y reafirma su pronunciamiento de 14 de abril de 1988.*

El 13 de julio de 1988, mediante resolución al efecto, se precisaron las cuestiones a tratar en la Conferencia Judicial convocada, para evaluar, informar y hacer las recomendaciones, y se creó un comité asesor integrado por distinguidos miembros de la Judicatura y de la profesión de abogado.

Con la colaboración y ayuda técnica del Secretariado de la Conferencia Judicial, el Comité Asesor sobre Independen-

cia Judicial cumplió cabalmente con su encomienda y presentó, fechado el 20 de septiembre de 1988, un comprensivo estudio contentivo de alternativas y recomendaciones sobre el tema.

El informe del comité asesor fue sometido al análisis de los miembros de la Conferencia Judicial, quienes en sus deliberaciones expresaron sus posiciones y recomendaciones.

El Tribunal, después de estudiar y considerar el informe y las recomendaciones del comité asesor, y atender las deliberaciones de la Conferencia Judicial, adopta las determinaciones y acuerdos siguientes:

## I

*Sistema de evaluación judicial*

1. La evaluación judicial, por iniciativa y bajo la responsabilidad de la Rama Judicial, parte del reconocimiento de dos (2) realidades básicas:

(a) La Rama Judicial no está sujeta a ser evaluada por la comunidad directa y periódicamente como lo están las Ramas Ejecutiva y Legislativa. La fiscalización que hace la comunidad de la Rama Judicial es indirecta porque se hace por conducto de estas dos (2) ramas.

(b) La independencia judicial tiene como contrapartida importantes responsabilidades y, entre éstas, se halla comprendida rendir cuentas a la comunidad a quien le presta servicios. La verdadera independencia judicial se fortalece por la confianza que los ciudadanos tengan en sus tribunales. Por tal motivo, cualquier reclamo por mayor independencia judicial está inextricablemente atado al ejercicio riguroso de una fiscalización que abarque el mejoramiento del desempeño judicial, el aspecto disciplinario y el compromiso de rendir informes periódicos a la comunidad sobre la labor de la Judicatura.

2. Atendiendo lo anterior, se crea un Sistema de Evaluación Judicial, el cual tiene las metas y objetivos siguientes:

(a) El mejoramiento profesional de los integrantes de la Judicatura.

(b) Proveer un mecanismo para ofrecer información al Poder Ejecutivo sobre aquellos jueces sujetos al proceso de renominación o ascenso.

(c) Proveer un mecanismo para obtener información que ayude en la determinación de decisiones administrativas, tales como asignaciones, traslados o designaciones de jueces en puestos de jerarquía superior.

3. El Tribunal, mediante resolución, nombrará el Comité de Evaluación Judicial, el cual estará integrado por un Juez del Tribunal Supremo, quien será su presidente, y ocho (8) miembros adicionales.

4. Los jueces del Tribunal de Primera Instancia y del Tribunal Municipal serán evaluados con la prioridad, regularidad y periodicidad que los objetivos del programa y necesidades del sistema requieran.

5. El Comité de Evaluación Judicial ejercerá sus funciones de manera autónoma y decidirá los asuntos de política administrativa respecto al desarrollo, implantación y administración de las evaluaciones judiciales. Contará con una oficina administrativa y recursos de personal de apoyo, responsables de la labor diaria de, entre otras, archivar información, enviar cuestionarios y citaciones, coordinar las citas y reuniones, y servir de enlace con la Oficina de Administración de los Tribunales para la recopilación de la información necesaria. La selección de las fuentes de información, así como los métodos para recopilar los datos de una manera eficiente, veraz y metódica, deberá ser objeto de un análisis riguroso por parte del Comité de Evaluación Judicial con la ayuda de los técnicos y asesores que colaborarán en el diseño e instrumentación del programa. En la consecución de este fin, podrán utilizar las fuentes y métodos que estimen necesarios para sus fines y propósitos.

6. Los jueces serán evaluados a base de los criterios siguientes:

(a) Integridad – rectitud, honradez e imparcialidad.

(b) Temperamento – carácter; manera como el juez se desenvuelve desde el punto de vista de su forma de reaccionar ante otras personas.

(c) Competencia y destrezas profesionales – habilidad para conocer y entender el derecho sustantivo, procesal y probatorio. Habilidad para desempeñarse fiel y adecuadamente en el cargo de juez.

(d) Laboriosidad y diligencia – habilidad para distribuir su tiempo de forma tal que le dedique a cada asunto el tiempo apropiado, tomando en consideración el tiempo disponible, la urgencia del asunto y el tiempo que lleva pendiente.

7. La evaluación estará predicada en la franca y abierta comunicación con el juez evaluado. Esta comunicación comenzará con una notificación que le indique la fecha de la evaluación, y la información que tiene que suplir incluye, entre otras, la contestación a un cuestionario de autoevaluación y el envío de un determinado número de sentencias y escritos con el objetivo de examinar su capacidad analítica.

Luego de analizada toda la información recopilada, el Comité de Evaluación Judicial le cursará comunicación al juez exponiéndole los hallazgos e invitándole a comparecer a una reunión donde tendrá la oportunidad de presentar sus puntos de vista.

El Comité de Evaluación Judicial redactará un informe de evaluación, el cual reflejará la información en forma resumida, expondrá los hallazgos a base de los cuatro (4) criterios previamente definidos, especificará las áreas deficientes y sobresalientes, recomendará las áreas que necesitan desarrollarse y formulará cualquier otra conclusión u observación que estime pertinente.

8. En los casos de renominación y otros casos apropiados, el Comité de Evaluación Judicial le suministrará directamente al Primer Ejecutivo el informe de evaluación mediante una carta que indicará los años de servicio y los cargos ocupados, una evaluación concisa a base de los criterios antes señalados y un juicio valorativo sobre sus cualificaciones.

9. El Comité de Evaluación Judicial le enviará copia de los informes de evaluación periódicos, que tengan por objetivo lo dispuesto en la Parte I, párrafo 2(a) y (c), al juez evaluado, al Juez Presidente y al Director Administrativo de los Tribunales.

Copia del informe de evaluación con fines de renominación o ascenso y copia de la carta que se envía al Ejecutivo se remitirán al juez evaluado y al Tribunal Supremo.

10. Excepto por lo dispuesto en el párrafo 8 anterior, todo informe de evaluación y la información que recopile el Comité de Evaluación Judicial en este proceso de evaluación será confidencial. Sólo tendrán acceso a éste los miembros del Comité de Evaluación Judicial, el juez evaluado, el Juez Presidente, los Jueces Asociados y el Director Administrativo de los Tribunales.

11. La carta de evaluación que será enviada a las Ramas Ejecutiva y Legislativa tendrá carácter de documento público y deberá ser publicada anualmente como parte de un informe anual que dicho Comité de Evaluación Judicial deberá rendir.

12. Una vez establecido el sistema de evaluación de la Rama Judicial, en atención a la rigurosidad del mismo, se propone que para fortalecer la independencia judicial la recomendación que rinda el Comité de Evaluación Judicial al Primer Ejecutivo tenga el efecto de renominar al juez que reciba el calificativo de "calificado" y sustituir al "no calificado".

## II

*Ejercicio del poder disciplinario*

El Tribunal tiene ante su consideración una propuesta de reglamento para el ejercicio de su jurisdicción disciplinaria sobre el cual dictaminará a la brevedad posible y determinará si resulta necesario recomendar cambios en la legislación vigente.

## III

*Término de nombramiento de jueces*

1. La fijación por ley de términos de limitada duración en los cargos judiciales en el Tribunal de Primera Instancia y los Jueces Municipales, por la combinación de diversos factores, no propicia el ideal de excelencia en el reclutamiento y retención de jueces y tiende a debilitar la independencia judicial.

Bajo el sistema actual de nombramiento a término, mantener por tiempo innecesario un juez cuyo término ha vencido bajo la cláusula de continuidad (*holding over*) constituye una amenaza evidente a la independencia judicial. Ello lo expone a presiones psicológicas y lo puede convertir en blanco de influencias indebidas. Es fundamental, si se quiere fortalecer la independencia judicial y proteger a los miembros de la Judicatura de las presiones e inconvenientes que implica el actual sistema de renominación de nombramientos, que se adopte la recomendación que se formula a continuación.

2. A los fines de afianzar y fortalecer la independencia judicial se recomienda legislación que establezca para los Jueces del Tribunal de Primera Instancia y para los Jueces Municipales un término inicial de siete (7) años y, si fueren renominados para el cargo, que continuarán en él mientras lo desempeñen fiel y adecuadamente y observen buena conducta. Además, se propone que se eleve a rango constitucional este sistema de nombramientos.

## IV

*Nombramiento inicial de jueces*

1. La experiencia histórica demuestra que el sistema de selección de jueces, en el cual el Gobernador controla todo el proceso, sujeto únicamente a un eventual poder de veto del Senado, necesita ser mejorado.

La determinación respecto a quién y cómo se seleccionan los jueces supone, entre otras, la decisión de hasta qué medida las fuerzas políticas prevalecientes habrán de participar en el proceso de selección.

Bajo el esquema constitucional de tres (3) poderes que rige nuestra sociedad, el juez desempeña una importante función como forjador de política pública. No se puede, por tal razón, cercenar el sistema democrático y desligar totalmente el proceso de selección de aquellos que le responden directamente al pueblo.

Las ramas eminentemente políticas —Ejecutiva y Legislativa— son parte vital en cualquier proceso de selección.

Un sistema de selección judicial fundamentado en la idoneidad y méritos de los aspirantes es totalmente armonizable con los principios expresados. Dicho sistema representa la mejor garantía para el desarrollo pleno de la independencia judicial, principio indispensable dentro del régimen de una verdadera democracia.

2. Como medida a corto plazo, se recomienda al Honorable Gobernador que, mediante Orden Ejecutiva, designe un Comité Asesor de Nombramientos Judiciales Iniciales, cuya composición representativa sería la siguiente: tres (3) miembros *ex officio*, el Director Administrativo de los Tribunales, un ex Juez del Tribunal Supremo y el Presidente del Colegio de Abogados; tres (3) abogados nombrados por el Honorable Gobernador, y tres (3) ciudadanos que no sean abogados nombrados, a su vez, por los otros seis (6) miembros designados.

Este Comité Asesor de Nombramientos Judiciales Iniciales evaluará y recomendará los candidatos más idóneos, fundándose exclusivamente en sus méritos. Tal función no limita el ejercicio del poder nominador, ya que éste podrá enviar para evaluación tantos candidatos como quiera. La evaluación rigurosa bajo criterios y términos expresos y la ampliación del ámbito de la investigación brindarán garantías de buen asesoramiento.

Deberá asignársele su propio presupuesto, contar con el asesoramiento técnico necesario y operar totalmente de forma autónoma.

El principio de la independencia judicial se fortalece si el Gobernador sólo selecciona entre los candidatos que le certifique este comité.

3. Como medida a mediano plazo, se recomienda que el Comité Asesor de Nombramientos Judiciales Iniciales se instaure por la vía legislativa salvando, dentro del marco constitucional vigente, los poderes y facultades del poder nominador y reconociendo que su función sea estrictamente de asesoramiento. La legislación, sin limitar la discreción del poder nominador, incorporaría un sistema predicado en la idoneidad y méritos de los candidatos, estatuiría los criterios de selección, aseguraría una composición similar a la recomendada para el comité asesor que se cree por Orden Ejecutiva, facilitaría los recursos mínimos de funcionamiento y dispondría el reclutamiento activo de los candidatos idóneos.

4. Para garantizar la existencia permanente de dicho Comité Asesor de Nombramientos Judiciales Iniciales e imprimirle obligatoriedad a sus recomendaciones, se recomienda que a la primera oportunidad se eleve a rango constitucional reconociendo la autoridad nominadora del Primer Ejecutivo y la facultad de consejo y consentimiento del Senado.

5. No se endosa al presente la institución del Consejo Judicial a nivel constitucional.

# V

*Autonomía presupuestaria*

1. La Rama Judicial reconoce la necesidad de mantener y reforzar tanto la estructura de fiscalización interna como la ejercida por las otras ramas. La autonomía fiscal y administrativa están también atadas a la responsabilidad de rendir cuentas.

El presupuesto es el instrumento a través del cual se considera, se aprueba, se ejecuta y se controla la acción de un organismo. Por tal razón, el proceso de aprobación del presupuesto gubernamental es de vital importancia para la Rama Judicial y, sin embargo, ésta no tiene en ese proceso participación directa alguna. Su intervención se limita a la mera solicitud de fondos para los gastos de funcionamiento y no tiene inherencia alguna en la aprobación o veto de dicha asignación.

Como consecuencia, la independencia del poder judicial se afecta en la medida que las otras dos (2) ramas de gobierno, a través del control de las asignaciones de fondos, puedan limitar su capacidad para satisfacer las necesidades básicas del sistema e impedir el desarrollo de proyectos y medidas de importancia encaminadas a obtener mayor eficiencia. Esto se traduciría inevitablemente en una baja de calidad en la administración de la justicia, aun cuando la facultad de adjudicar no se afecte directamente en casos específicos.

A fin de subsanar las dificultades e inconveniencias que confronta la Rama Judicial en el proceso de la aprobación presupuestaria, es necesario que, con carácter de urgencia, se le reconozca a la Rama Judicial una autonomía presupuestaria real mediante un mecanismo de asignación automática.

2. La recomendación es, por lo tanto, que se promueva legislación que garantice la autonomía en la fase de formulación de presupuesto y se asigne un porcentaje fijo (4%) del

promedio del monto total de las rentas anuales ingresadas al fondo general, tomando como fundamento los dos (2) años económicos inmediatamente anteriores al año económico en vigencia. En ningún caso la asignación sería menor que la del año económico inmediatamente anterior, excepto si las rentas anuales ingresadas al fondo general en que se fundamenta la fórmula sufran una reducción por razón de cambios en la economía.

3. Como consecuencia de la aprobación de la Ley Núm. 230 de 23 de julio de 1974 (Ley de Contabilidad de Gobierno), 3 L.P.R.A. sec. 283 y ss., que otorgó a la Rama Judicial autonomía fiscal en el área de preintervención de las transacciones fiscales, esta rama ha reestructurado las partes de su organización que participan del subsistema de asuntos fiscales, logrando la existencia de una infraestructura que le permite asumir responsabilidad plena en la contabilidad de ingresos y gastos, y en el control y contabilidad de los activos fijos.

Para culminar la autonomía fiscal de la Rama Judicial en las áreas de administración y control de los fondos asignados, es necesario concederle autonomía en la utilización y control de los mismos.

4. Se recomienda que, junto con la legislación de asignación automática, se promueva legislación para que la Rama Judicial tenga la autoridad en ley de custodiar, controlar y usar los fondos asignados para su funcionamiento, así como para mantener su propio sistema de contabilidad independiente del Departamento de Hacienda.

5. En lo que respecta a la administración de personal, la Rama Judicial como rama independiente de gobierno posee un sistema autónomo de administración de personal, conforme con lo dispuesto por la Ley Núm. 64 de 31 de mayo de 1973 (4 L.P.R.A. sec. 521).

Sin embargo, a pesar del alcance de dicha ley, aún quedan vestigios de dependencia que de hecho minan la autonomía

de esta rama en la administración de esos asuntos. Ejemplos ilustrativos de esta realidad son la limitación que establece la Ley Núm. 95 de 29 de junio de 1963 (3 L.P.R.A. sec. 729a), "Ley de Beneficios de Salud para Empleados Públicos", que cubre bajo su definición de "empleados" a todas las ramas de gobierno y, como tal, faculta al Secretario de Hacienda a contratar planes de servicios médicos para los funcionarios y empleados de la Rama Judicial, y la Ley Núm. 12 de 19 de octubre de 1954 (4 L.P.R.A. secs. 233–246), que coloca el Sistema de Retiro de la Judicatura bajo la Administración de la Junta de Síndicos de Retiro de los Empleados del Estado Libre Asociado de Puerto Rico.

6. Cónsono con la autonomía de personal concedida en virtud de la Ley Núm. 64, *supra*, se recomienda promover legislación a los efectos de reconocer, mediante enmienda a la Sec. 3(b) de la Ley Núm. 95 (3 L.P.R.A. sec. 729c(b)), la facultad expresa de la Rama Judicial para negociar directa e independientemente los planes médicos para sus empleados y funcionarios.

7. Se recomienda, además, enmendar la Ley Núm. 12, *supra*, para eliminar la coadministración del Sistema de Retiro de la Judicatura y trasladar dicha administración a la Rama Judicial.

8. Una vez se traslade a la Rama Judicial la facultad de administrar su Sistema de Retiro, se realizarán los estudios conducentes a determinar la razonabilidad y viabilidad de las aportaciones y beneficios.

9. Respecto a la compensación y sueldos de los jueces —aparte de la imperiosa necesidad de que sean adecuados y que a la brevedad sean examinados para conformarlos con el aumento real en el costo de vida— el Tribunal no endosa la recomendación de que se deje la fijación de los salarios de los jueces en manos de la Rama Judicial.

# VI

*Demarcación territorial y sedes de los tribunales; participación en el proceso electoral; representación legal de los jueces; implantación de determinaciones; reconocimiento*

1. Las determinaciones sobre la demarcación y sede de las salas de los Tribunales de Puerto Rico ha correspondido históricamente a la Rama Legislativa y la participación de la Rama Judicial ha sido muy limitada, ya que el esquema estatutario no permite que se le consulte o dé participación en estas determinaciones. Ello es así a pesar de que es la Rama Judicial la que tiene la responsabilidad de utilizar sus recursos en la forma más eficiente posible. No deben intervenir criterios ajenos al del mejor funcionamiento de la Rama Judicial en su servicio a la ciudadanía en la determinación de tales asuntos.

A tenor con lo anterior, se recomienda legislar para que se delegue en el Juez Presidente la determinación de la demarcación territorial y fijar las sedes del Tribunal de Primera Instancia y de los Tribunales Municipales, sujeto a que éste someta los cambios necesarios a la aprobación o desaprobación de la Legislatura siguiendo el mecanismo señalado en el Art. V, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1.

2. Reconocemos que existe una preocupación legítima con la participación de los jueces en el proceso electoral como presidentes de las juntas electorales. Aunque esta participación tiene raíces históricas cimentadas en la confianza que tiene el Pueblo de Puerto Rico en la Judicatura como árbitro de sus contiendas, es deseable que las tres (3) ramas de gobierno reexaminen la deseabilidad de continuar con esta práctica a los fines de evitar, de ser viable, colocar a los jueces en el centro de la contienda partidista y así fortalecer la independencia judicial.

3. La facultad por ley del Secretario de Justicia para determinar si se asume la representación de un juez que es

demandado en su capacidad oficial por alegadas violaciones de los derechos civiles y la de determinar si procede el pago total de la sentencia que le fuera impuesta, incide también con la independencia judicial. Se recomendará legislación remedial al efecto.

4. El Juez Presidente tomará todas las medidas administrativas necesarias para implantar las determinaciones y acuerdos aquí contenidos.

A los fines de implantar a la brevedad posible las medidas que estas determinaciones acarrean en la esfera de acción de sus respectivas competencias, se ordena notificar copia de esta resolución con copia del Informe del Comité Asesor sobre Independencia Judicial al Gobernador de Puerto Rico, Hon. Rafael Hernández Colón, y a la Asamblea Legislativa de Puerto Rico por conducto del Presidente del Senado, Hon. Miguel Hernández Agosto, y el Presidente de la Cámara de Representantes, Hon. José Ronaldo Jarabo.

El Tribunal expresa su reconocimiento a los distinguidos miembros del Comité Asesor sobre Independencia Judicial y a la plantilla del Secretariado de la Conferencia Judicial por la labor de excelencia realizada en la encomienda que recibiera, así como por la redacción detallada, profunda y excelente del informe sometido.

Integraron el Comité Asesor sobre Independencia Judicial los miembros siguientes:

Lcdo. Rubén Rodríguez Antongiorgi, Presidente
Hon. Miguel A. Rivera Arroyo
Hon. Abner Limardo Sánchez
Hon. Ángel F. Rossy García
Hon. Pedro López Oliver
Hon. Ángel G. Hermida
Hon. Fernando Gierbolini Borelli
Hon. William F. Santiago Vázquez
Lcda. Judith Berkan

Lcdo. Carlos Ríos Gauthier

Lcdo. Noel González Miranda

Lcdo. Benjamín Rodríguez Ramón

Lcdo. Samuel Céspedes

Lcdo. Manuel Martínez Umpierre

Lcdo. Salvador Antonetti

Lcdo. José Enrique Otero

Lcdo. Raúl González Díaz

Lcda. Maggie Correa

Lcda. Maricarmen Ramos de Szendrey

El Hon. René Arrillaga Beléndez y el Lcdo. Lino J. Saldaña fueron designados miembros *ex officio* del comité.

Constituyeron la plantilla del Secretariado de la Conferencia Judicial los funcionarios siguientes:

Lcda. Carmen H. Carlos de Dávila

Lcda. Lorraine Riefkohl

Lcda. Fabiola Fernández

Lcda. Nydia Castro

Lcda. Vilma T. Torres

*Publíquese.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto explicativo de conformidad. El Juez Asociado Señor Rebollo López emitió voto disidente. En vista de que el voto explicativo de conformidad del Juez Asociado Señor Negrón García y el voto disidente del Juez Asociado Señor Rebollo López no circularon antes del mediodía de hoy, todos los jueces del Tribunal se reservan el derecho a expresarse de conformidad con lo dispuesto en la Regla 4 del Reglamento del Tribunal, 4 L.P.R.A. Ap. I-A.

(*Fdo.*) Bruno Cortés Trigo
*Secretario General*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La presente Sesión Especial de la Conferencia Judicial de Puerto Rico, la cual tiene su génesis en la resolución que emitiera el Tribunal Supremo de Puerto Rico con fecha 14 de abril de 1988, definitivamente no se hubiera podido celebrar a no ser por la extraordinaria y desinteresada labor realizada por los distinguidos y prestigiosos miembros del Comité Asesor sobre Independencia Judicial de la referida Conferencia, en especial por el Presidente de dicho comité asesor, el Lcdo. Rubén Rodríguez Antongiorgi, abogado que durante más de cuatro (4) décadas le ha dado lustre a nuestra profesión. A los miembros de ese comité, nuestro profundo agradecimiento y reconocimiento.

Pecaríamos de injustos si no mencionáramos, en adición, a los integrantes del Secretariado de la Conferencia Judicial, hábilmente dirigidos los mismos por la Lcda. Carmen H. Carlos de Dávila. En palabras de la inmensa mayoría de los miembros del Comité Asesor sobre Independencia Judicial, el trabajo que ellos han realizado no hubiera sido jamás posible sin la labor que llevara a cabo el personal —tanto profesional como clerical— de ese Secretariado; personal que, con gran orgullo expresamos, nunca nos ha defraudado.

I

Comparecemos en el día de hoy ante esta Sesión Especial de la Conferencia Judicial de Puerto Rico en forma separada del resto de los integrantes del Tribunal Supremo no por razón de que diferamos diametralmente de las conclusiones contenidas en la resolución que ha tenido a bien emitir el Tribunal en el día de hoy. De hecho, y como se habrán podido percatar todos ustedes, ello es casi imposible por cuanto el Tribunal prácticamente ha acogido todas y cada una de las

recomendaciones que hiciera el Comité Asesor sobre Independencia Judicial en el informe que rindiera.

La razón de esta comparecencia en forma individual se debe a una diferencia de actitud; una diferencia de criterio sobre cuál es la posición que en el día de hoy debe asumir el Tribunal ante las otras dos (2) ramas de nuestro Gobierno respecto a la materia o tema en controversia.

La mayoría de los integrantes del Tribunal entiende que se deben limitar meramente a *recomendar* a las Ramas Ejecutiva y Legislativa de nuestro Gobierno que tomen los pasos necesarios para que la Rama Judicial pueda lograr el objetivo deseado de independencia judicial. Nosotros, por el contrario, en vista del gran número de años a través de los cuales la Rama Judicial ha estado pacientemente esperando que se le reconozca el sitial de completa igualdad que le corresponde dentro de nuestro sistema democrático de gobierno, y en vista de los acontecimientos de los últimos tiempos que han causado que este Tribunal haya celebrado esta histórica Sesión Especial de la Conferencia Judicial de Puerto Rico, somos del firme criterio que ha llegado el momento de *exigirle* a las otras dos (2) ramas del Gobierno que procedan sin dilación alguna a realizar las gestiones necesarias para que esta Rama Judicial verdaderamente goce de independencia.

En otras palabras, a nuestro humilde entender, ya basta de estudios, de informes y de recomendaciones. *Ha llegado la hora de actuar y de exigir.*

Antes de proseguir adelante, queremos dejar claramente establecido que nuestra intención no es la de ofender o herir la sensibilidad de persona alguna, presente o ausente de esta Sesión Especial de la Conferencia Judicial de Puerto Rico. Comparecemos atendiendo únicamente los dictados de nuestra conciencia; totalmente libres de cualquier influencia ajena a los mejores intereses de la Rama Judicial y de nuestro País, y porque entendemos que si así no lo hiciéramos

estaríamos incumpliendo con el juramento que prestáramos el día en que tomamos posesión del cargo que ocupamos.

## II

Como es de todos conocido, el tema de la independencia judicial no es de reciente cuño y discusión. Los problemas que continuamente aquejan a la Rama Judicial por la carencia de autonomía presupuestaria, por la existencia del sistema de nombramientos a término en relación con los jueces del Tribunal de Primera Instancia y por la ausencia de inherencia de parte del Poder Judicial en la selección original y renominación de sus jueces ha sido objeto de anterior consideración por parte de la Conferencia Judicial.

No éramos conscientes, sin embargo, de cuán largo era su historial. Recientemente tuvimos la oportunidad de leer unas manifestaciones, provenientes las mismas de uno de los más respetados miembros de la Judicatura puertorriqueña, el Hon. Guillermo A. Gil Rivera, según éstas fueran reseñadas en la edición del 30 de julio de 1964 del desaparecido periódico *El Imparcial* por el ya fallecido periodista Pedro A. Reyes Vargas.

En aquella ocasión, el ex Juez Gil Rivera, a quien me unen cercanos y estrechos lazos de afinidad, expresó —al reintegrarse a sus labores como juez del Tribunal Superior de Puerto Rico después de haber renunciado al puesto que ocupara como Administrador de los Tribunales— que:

> Considero mi deber hacer constar aquí la experiencia dolorosa que tuve durante cuatro años por las circunstancias en que se desenvuelve la Rama Judicial. Se habla mucho, se ha hablado y se sigue hablando de independencia judicial en Puerto Rico, y quiero decir aquí que en la esfera administrativa la Rama Judicial no disfruta de independencia alguna. *El Imparcial*, 30 de julio de 1964.

Agregó, en conclusión, en dicha ocasión el referido ex magistrado del Tribunal Superior, que se hablaría más propia-

mente "si en lugar de hablarse de la independencia judicial, se hablara del coloniaje judicial". *El Imparcial,* ante.

De igual valor ilustrativo resultan ser las declaraciones que hiciera el licenciado Gil Rivera en una comparecencia ante la Comisión de lo Jurídico del Senado de Puerto Rico, según las mismas fueron reportadas en las ediciones del 8 de mayo de 1965 de los periódicos *The San Juan Star* y *El Mundo* por los periodistas Manny Suárez y Víctor M. Padilla, respectivamente. En dicha ocasión, el Juez Gil Rivera favoreció ante dicho Cuerpo Legislativo una propuesta enmienda a la Constitución del Estado Libre Asociado a los fines de darle inherencia a la Rama Judicial en el nombramiento de los jueces del Tribunal de Primera Instancia. Consideró el Juez Gil Rivera como una situación absurda que el Tribunal Supremo de Puerto Rico, que es la institución que en última instancia es la responsable de la labor que rinden y la conducta que observan dichos jueces, no tuviera voz alguna en su selección y renominación.

Transcurrido un cuarto de siglo desde las manifestaciones a las que hemos hecho referencia, no hay duda de que la Rama Judicial ha obtenido algunos logros en las áreas de planta física y condiciones de trabajo. Respecto a la deseada y necesaria independencia judicial, sin embargo, continuamos en el mismo "coloniaje judicial" en relación con las otras dos (2) ramas de nuestro Gobierno.

## III

La ausencia de autonomía presupuestaria, esto es, el no contar con una fórmula automática mediante la cual se compute el presupuesto, obliga a la Rama Judicial a confeccionar uno anualmente y a justificar una y otra vez dicho presupuesto ante representantes de los Poderes Ejecutivo y Legislativo, lo cual le toma precioso tiempo a todos los funcionarios de la Rama Judicial encargados de dicha tarea que podrían dedicarle al mejoramiento general de la Rama

Judicial. Ello resulta ser sumamente discriminatorio e injusto cuando consideramos que la Rama Legislativa no tiene que justificar su presupuesto en ninguna forma y meramente informa la suma de dinero englobada que entiende necesita para sus operaciones anuales. Esta gestión que viene obligada a realizar la Rama Judicial, en adición, propicia la oportunidad para que se intente manipular e influenciar a dicha rama, lo cual constituye un secreto a voces. Esa situación, aun cuando no ocurra, no es lo más aconsejable como principio de sana administración pública.

Por otro lado, la carencia de nombramientos vitalicios, unido ello a las indeseables prácticas de nombrar "jueces de receso", esto es, mientras la Asamblea Legislativa no está en sesión, y la práctica de mantener jueces en sus cargos —una vez sus nombramientos han vencido— por largos períodos de tiempo sin renominarlos para otro término, ha propiciado y fomentado el intento de influenciar el criterio judicial de dichos magistrados en relación con casos ante su consideración. Realmente puede considerarse extremadamente afortunado el juez del Tribunal de Primera Instancia que no haya sido víctima de crudos y/o sofisticados intentos de influenciar su criterio judicial. Meramente como materia de interés al tópico en discusión, debe recordarse que hace escasamente dos (2) años, gracias al fuerte clamor de nuestra ciudadanía y a una efectiva e incesante campaña periodística, se logró que los miembros de la Asamblea Legislativa que pertenecen a nuestra profesión aprobaran un acuerdo mediante el cual autolimitaran sus comparecencias ante los tribunales, en su carácter de abogados, en casos criminales.

Afortunadamente para Puerto Rico, tanto la Rama Judicial como institución como la inmensa mayoría de los jueces de instancia —por no decir todos— siempre han actuado con la rectitud y la firmeza necesaria que se requiere y han sabido rechazar esas tentativas de influencia indebida.

Ahora bien, los seres humanos no son todos iguales; no todos son fuertes y firmes; no todos reaccionan de igual forma y manera ante una situación en particular. Nadie sabe ni puede asegurar cómo actuaría al enfrentarse ante una situación de esa naturaleza en un momento de su vida en que se encuentre en edad madura, estando próximo a la jubilación y con un nombramiento vencido o por vencerse. Al no poderse garantizar y en vista de los atentados de que ha sido objeto esa independencia judicial en tiempos recientes, somos del criterio que en el día de hoy venimos en la obligación de *exigir* el nombramiento de carácter vitalicio para todos nuestros jueces de instancia. Resulta necesario que ello se logre para el bienestar y tranquilidad, no de nuestros jueces, sino de la sociedad puertorriqueña en general. *Ha llegado el momento, repetimos, de exigirlo.*

Una advertencia, sin embargo. No hay duda que factores tales como nombramientos de carácter vitalicio, sueldos decorosos y demás recomendaciones contenidas en el informe rendido por el Comité Asesor sobre Independencia Judicial ayudan a que exista la deseada independencia judicial. Ello es así por cuanto dichos factores conceden al juez que es independiente una mayor tranquilidad de espíritu. Los mismos, sin embargo, no constituyen una garantía absoluta de que existirá dicha independencia.

Hemos conocido, y creo que todos ustedes también, compañeros jueces, que no obstante contar con un nombramiento vitalicio, no han podido actuar con independencia de criterio debido a que nunca pudieron cortar el cordón umbilical que les ataba a su pasado. Porque señores, no nos engañemos: de la misma forma que el hábito no hace al monje, el uso de una toga no hace automáticamente juez a una persona, aun cuando el mismo cuente con un nombramiento vitalicio.

Debe mantenerse presente que el factor verdaderamente determinante lo es la calidad o fibra de que está hecho el ser

humano que en un momento determinado se encuentra ocupando el cargo de juez.

## IV

Un análisis y estudio de la legislación, *referente a la Rama Judicial*, aprobada por la Asamblea Legislativa de Puerto Rico durante los pasados cuatro (4) años, arroja resultados verdaderamente curiosos y sorprendentes.[1]

*Durante el año de 1985*, tanto la Cámara de Representantes como el Senado de Puerto Rico aprobaron las siguientes medidas relativas a la Rama Judicial:

1. Resolución Conjunta Núm. 40 de 27 de junio de 1985 (1985 Leyes de Puerto Rico 474), mediante la cual se le asignó la suma de $1,500,000 al Tribunal General de Justicia con el propósito de que éste pudiera cubrir la deficiencia de recursos que confrontaba durante el año fiscal 1984–1985.

2. Resolución Conjunta Núm. 53 de 2 de julio de 1985 (1985 Leyes de Puerto Rico 497), mediante la cual se asignó la suma de $2,500,000 al Tribunal General de Justicia para que éste pudiera continuar la obra de mejoras físicas al edificio donde ubica el Tribunal Supremo de Puerto Rico.

3. La Ley Núm. 21 de 24 de julio de 1985 (4 L.P.R.A. sec. 231(a)), aumentándole los salarios a los Jueces del Tribunal Supremo de Puerto Rico.

Resulta procedente que se señale, por último, en cuanto al año de 1985, que ambas Cámaras legislativas aprobaron una ley mediante la cual se le asignaba la suma de $100,000 a la Administración de los Tribunales para establecer una escuela judicial, pero la misma fue vetada por el Gobernador mediante "veto de bolsillo" de 13 de julio de 1985.

*Durante el año de 1986*, la Asamblea Legislativa aprobó las siguientes medidas relativas a la Rama Judicial:

---

[1] Toda la información que a continuación exponemos sobre el trámite legislativo proviene de información provista por Escrutinio Legislativo, Inc.

1. Resolución Conjunta Núm. 27 de 15 de mayo de 1986 (1986 Leyes de Puerto Rico 521), asignándole la suma de $800,000 a la Administración de los Tribunales para iniciar la construcción de la tercera planta del edificio donde ubica el Tribunal Superior de Arecibo.

2. Resolución Conjunta Núm. 68 de 27 de junio de 1986 (1986 Leyes de Puerto Rico 571), autorizando al Tribunal General de Justicia a utilizar cualesquiera fondos disponibles de ciertas asignaciones de los años de 1983 y 1985 para atender las necesidades del Tribunal Supremo de Puerto Rico.

3. Ley Núm. 91 de 9 de julio de 1986 (4 L.P.R.A. sec. 231), aumentándole el salario a los Jueces del Tribunal Superior, a los Jueces del Tribunal de Distrito y a los Jueces de Paz.

4. Ley Núm. 92 de 9 de julio de 1986 (4 L.P.R.A. sec. 214), aumentando el salario a los jueces municipales.

El 22 de diciembre de 1986, el Tribunal Supremo de Puerto Rico resolvió el caso de *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986). Mediante la mencionada decisión este Tribunal resolvió, en síntesis, que la Regla 7.1 del Reglamento del Senado de Puerto Rico —la cual permitía la exclusión de los miembros de las minorías parlamentarias de los trabajos de la Comisión de lo Jurídico de dicho Alto Cuerpo Legislativo— era inconstitucional por cuanto violaba, entre otras, las disposiciones del Art. III, Sec. 7 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, que garantiza la representación efectiva de dichas minorías en nuestra Asamblea Legislativa.

*Durante el año de 1987* no se aprobó en el Senado de Puerto Rico ninguna medida relacionada con la Rama Judicial. Un examen de los diferentes proyectos de ley radicados tanto en la Cámara de Representantes como en el Senado demuestran que las medidas que fueron radicadas corrieron la suerte siguiente:

1. Proyecto Resolución Conjunta del Senado Núm. 1820 – para asignarle $1,000,000 al Tribunal General de Justicia para completar la realización de mejoras físicas al edificio del Tribunal Supremo. Radicado el 12 de marzo de 1987 (Senado) y recibido en forma impresa por Comisión de Hacienda y de lo Jurídico el 24 de marzo de 1987. *No ha habido ulterior trámite.*

2. Proyecto Resolución Conjunta del Senado Núm. 1821 – para asignarle $3,120,000 a la Administración de los Tribunales para construir un Centro Judicial en Arecibo. Radicado el 12 de marzo de 1987 (Senado) y recibido en forma impresa por Comisiones de Hacienda y de lo Jurídico el 24 de marzo de 1987. *No ha habido ulterior trámite.*

3. Proyecto de la Cámara Núm. 1075 / Proyecto del Senado Núm. 1121 (Cámara) – para incluir a los Jueces del Tribunal General de Justicia dentro del grupo de servidores públicos con derecho a pensión en caso de incapacidad o muerte sobrevenida en el ejercicio de sus funciones. Radicado el 12 de marzo de 1987 y aprobado por la Cámara de Representantes en votación final de 37 a 0 el 12 de mayo de 1987. El 13 de mayo se le dio lectura en el Senado y se refirió a Comisión. *No ha habido ulterior trámite.*

4. Proyecto de la Cámara Núm. 1076 / Proyecto del Senado Núm. 1124 – autorizando al Juez Presidente del Tribunal Supremo a manejar los fondos que le son asignados por la Asamblea Legislativa para el funcionamiento de la Rama Judicial sin sujeción a legislación y reglamentación del Departamento de Hacienda. Radicado el 12 de marzo de 1987. Aprobado por la Cámara de Representantes el 13 de mayo de 1987 en votación de 33 a 0. El 15 de mayo de 1987 se le dio lectura en el Senado, refiriéndose el mismo a las Comisiones de lo Jurídico y de Hacienda. *No ha habido ulterior trámite.*

5. Proyecto F 131 (Fortaleza) – para asignarle la suma de $500,000 a la Administración de los Tribunales para la remodelación del edificio donde está ubicado el Tribunal Superior

de Arecibo. Radicado el 19 de marzo de 1987. Actualmente en Comisión del Senado. *No ha habido ulterior trámite.*

6. Proyecto Resolución Conjunta del Senado Núm. 1919 – para asignarle la cantidad de $2,000,000 a la Autoridad de. Edificios Públicos para ampliar las facilidades del Centro Judicial de Mayagüez. Radicado el 29 de marzo de 1987. Recibido en forma impresa por la Comisión de Hacienda el 31 de marzo de 1987. *No ha habido ulterior trámite.*

7. Proyectos del Senado Núms. 1123 y 111 / Proyecto de la Cámara Núm. 1073 – para enmendar el Sistema de Retiro para la Judicatura a los fines de ampliar el derecho de pensiones para el cónyuge supérstite e hijos de los participantes en servicio que cumplan los requisitos establecidos. Radicado el 27 de marzo de 1987. *Derrotado en el Senado* el 11 de mayo de 1987.

Con posterioridad al Tribunal Supremo resolver en forma favorable al Estado, con fecha de 4 de noviembre de 1987, el caso de *Rexach Benítez v. Gobernador*, 119 D.P.R. 521 (1987), caso en que emitimos opiniones disidentes tanto el Juez Asociado Señor Negrón García como este servidor de ustedes, la Asamblea Legislativa de Puerto Rico, *durante el año de 1988*, aprobó dos (2) proyectos relativos a la Rama Judicial, a saber:

1. Proyecto F 161 (Fortaleza) – asignándole $400,000 a la Administración de los Tribunales para la remodelación del edificio donde ubica el Tribunal Supremo, el cual se convirtió en la Resolución Conjunta Núm. 181 de 22 de julio de 1988 (1988 Leyes de Puerto Rico 1216).

2. Proyecto Resolución Conjunta de la Cámara Núm. 2981 – asignando fondos ($800,000) para el Tribunal Supremo de Puerto Rico —originalmente asignados al Tribunal Superior de Arecibo— el cual se convirtió en la Resolución Conjunta Núm. 57 de 27 de mayo de 1988 (1988 Leyes de Puerto Rico 973). Originalmente derrotado por el Senado el

23 de junio de 1987; aprobado, en reconsideración por el Senado, el 5 de mayo de 1988.

## V

El caso del Hon. Guillermo Arbona Lago, "juez símbolo" de esta Sesión Especial sobre independencia judicial, es triplemente trágico.

*En primer lugar*, se trata del intento, a destiempo, de sustituir a un juez laborioso, eficiente, competente, honrado e íntegro que a través de doce (12) largos años ha honrado y le ha dado lustre, por medio de sus ejecutorias, a la Judicatura puertorriqueña. Se trata, en resumen, de un atentado, en su forma más cruda, contra un miembro de la Judicatura puertorriqueña.

En la única ocasión en que un ser humano accede voluntariamente a que se le ampute una parte de su cuerpo es cuando la misma está dañada y enferma y constituye una amenaza para su salud y bienestar general.

El Poder Judicial es un solo cuerpo. La acción de sustituir al compañero Arbona Lago constituye un intento de cercenar una parte saludable y llena de vida de ese cuerpo judicial. Sorprende, en su consecuencia, que la cabeza de ese cuerpo judicial —el Tribunal Supremo— no se exprese en el día de hoy en evitación de esa amputación. Causa, cuando menos, tristeza en nuestro espíritu que tras varios meses de intensa labor por parte de ese distinguido Comité Asesor sobre Independencia Judicial este Tribunal, en la resolución mayoritaria que emite, ni tan siquiera mencione que el Honorable Arbona Lago es un juez competente y calificado que merece ser renominado por el Poder Ejecutivo para un nuevo término.

Señor Juez Arbona Lago. El viernes pasado, en ocasión de que el Hon. William Fred Santiago, Juez del Tribunal Superior de Puerto Rico, se dirigiera a esta conferencia sobre uno de los temas en discusión en la misma —el de los nom-

bramientos vitalicios— éste hizo alusión a usted en palabras sumamente emotivas. Ello motivó que en forma espontánea las personas presentes en dicho día le tributaran, puestos de pie, un merecido y emotivo aplauso como demostración del aprecio y admiración que sienten por usted.

En dicha ocasión, aun cuando lo aplaudimos calurosamente, no nos pusimos de pie. No lo consideramos entonces necesario. En el día de hoy, en reconocimiento de su excelente, fructífera y destacada labor como juez a través de doce (12) largos años y en solidaridad con su persona, su distinguida familia y sus compañeros de la Judicatura puertorriqueña, para que no quede duda alguna del aprecio que sentimos por usted y por la labor que ha realizado como juez, *puestos de pie*, le tributamos un nuevo aplauso.

Resulta ser trágico, *en segundo término*, el caso del señor Juez Arbona Lago porque la acción del Poder Ejecutivo constituye y conlleva un aterrador mensaje al resto de los integrantes de la Judicatura puertorriqueña. Significa y representa que un juez del Tribunal de Primera Instancia puede ser sustituido por el ridículo fundamento de que a algún funcionario del Poder Ejecutivo —ya sea el propio Señor Gobernador o alguno de sus allegados— no le gustó o no le estuvo correcto una sola de las miles de decisiones que ese juez emitiera en doce (12) años de intensa y dedicada labor judicial.

No resulta ser necesario que se elabore y se extienda uno mucho para demostrar lo absurdo de dicha posición. Asumiendo —únicamente a los fines de la argumentación— que la decisión que se emitiera por el Juez Arbona Lago fuera en efecto incorrecta, tal parece que un juez no tiene el derecho, como ser humano que es, a equivocarse aun cuando sólo sea en una ocasión. Afortunados y bienaventurados deben ser los que poseen el monopolio de la verdad y de lo que es correcto.

Aparte del mensaje escalofriante que tiene esta acción del Poder Ejecutivo sobre el resto de la actual Judicatura

puertorriqueña, el mismo tendrá un efecto extraordinariamente nocivo a largo plazo sobre dicha Judicatura en el aspecto de reclutamiento. Cabe preguntarse, ¿qué joven abogado competente estará en el futuro en disposición de abrazar la carrera judicial cuando su permanencia en la misma va a depender del capricho incomprensible de una persona?

*En tercer lugar*, lo verdaderamente trágico de todo este asunto lo es que, si el Tribunal Supremo hubiera actuado a tiempo cuando el señor Juez Arbona Lago alzó su voz en solicitud de ayuda, lo ocurrido quizás hubiera podido ser evitado.

Recordaremos que el señor Juez Arbona Lago remitió al Tribunal Supremo una resolución que él emitiera con fecha de 5 de mayo de 1986 en el caso de *Pueblo International, Inc. v. Rivera Cruz*, Civil Núm. 80-6454. En la misma, luego de hacer un recuento de unas gestiones que alegadamente el Hon. Secretario de Justicia de Puerto Rico, Lcdo. Héctor Rivera Cruz, le había hecho extrajudicialmente para lograr su inhibición en el mencionado caso, el señor Juez Arbona Lago expresó, en lo pertinente, que:

> En relación con el señalamiento y mensaje de que el que suscribe debe abstenerse "voluntariamente" de continuar atendiendo en este caso por razón de que un hermano del que suscribe pueda o no estar bajo investigación por el Departamento de Justicia, *entendemos [que] constituye una impermisible amenaza de naturaleza chantajista que bajo ningún concepto el juez suscribiente puede tan siquiera considerar y por tanto, fue rechazada con indignación y la más profunda convicción, en el mismo momento y por el mismo conducto en que recibimos tan impropia y tendenciosa invitación.* (Énfasis suplido.) Citado en *Pueblo Int'l, Inc. v. Srio. de Justicia*, 117 D.P.R. 362, 363 (1986).

El Tribunal nunca atendió ni le dio curso a dicha queja.[2] Es por ello que con fecha de 9 de mayo de 1986, este Juez emitió un voto particular expresando, en lo pertinente, que:

Somos del criterio que el asunto planteado por la referida resolución amerita la más pronta y enérgica actuación por parte de este Tribunal en el ámbito de su jurisdicción disciplinaria como consecuencia de su poder inherente de reglamentar la profesión de abogado. La investigación a ser realizada esclarecería la situación, *poniéndole coto a una situación que no beneficia a nadie*, fijando responsabilidades, *si es que las mismas son procedentes*, sobre aquellos funcionarios del Departamento de Justicia de Puerto Rico y los miembros de la judicatura que tuvieron participación en los incidentes a que hace referencia la resolución emitida.

La resolución en controversia fue emitida por un juez del Tribunal Superior de Puerto Rico, la misma va dirigida al Señor Secretario de Justicia de Puerto Rico, y contiene graves y serias imputaciones que dependiendo del resultado final pueden constituir violaciones a los Cánones de Ética Profesional o a los Cánones de Ética Judicial. Permitir que el asunto planteado permanezca en el "limbo jurídico" por un tiempo indefinido le hace un grave daño al sistema de justicia en Puerto Rico.

El Señor Secretario de Justicia es el abogado del Pueblo de Puerto Rico. Su reputación como abogado y su buen nombre han sido puestos en entredicho por la resolución en controversia. Dicho funcionario tiene derecho, si es que no cometió los actos que se le imputan, a ser exonerado lo más rápidamente posible con el propósito de que sus funciones no se vean afectadas y los intereses del Pueblo de Puerto Rico, los cuales él representa, no se perjudiquen. Por otro lado, el señor Juez Arbona Lago es un funcionario de carrera que ocupa una importante posición dentro del Sistema Judicial puertorriqueño y tiene derecho a que sus señalamientos sean evaluados y considerados formalmente por este Tribunal. Por último, no debemos perder de vista ni descartar la posibilidad de que la

---

[2] En la consideración del referido asunto el Juez Asociado Señor Negrón García se inhibió y el Juez Asociado Señor Hernández Denton no intervino.

investigación demuestre que todo este enojoso asunto haya sido el producto de un malentendido. (Énfasis en el original y escolios omitidos.) *Pueblo Int'l, Inc. v. Srio. de Justicia*, supra, págs. 364–365.

Quién sabe, si la omisión en que incurrió este Tribunal al no actuar con prontitud y en forma enérgica en este asunto, fue malinterpretado por el Poder Ejecutivo. Tal vez se pensó que un juez superior que hace un reclamo de esta naturaleza y nunca recibe respuesta al mismo de parte del Tribunal Supremo es uno que no merece ser renominado.

## VI

Disentimos, en resumen, por razón de que la resolución que hoy emite una mayoría de los integrantes de este Tribunal es, en palabras de nuestro Pueblo, "más de lo mismo". Nunca adelantaremos nada ni lograremos la codiciada independencia judicial si meramente nos limitamos a hacer recomendaciones a las otras dos (2) ramas de gobierno. Desde hace, por lo menos, más de un cuarto de siglo dichas ramas de gobierno han hecho caso omiso a nuestras recomendaciones. Llegó la hora, repetimos, de exigir de los Poderes Ejecutivo y Legislativo cuando menos la aprobación inmediata de legislación concediéndole autonomía presupuestaria a la Rama Judicial y el nombramiento de carácter vitalicio a los jueces del Tribunal de Primera Instancia y jueces municipales.

Disentimos, en adición, por cuanto la resolución emitida no califica en forma alguna la acción del Ejecutivo que precisamente fue la razón de ser de la Sesión Especial convocada por el Tribunal: la sustitución a destiempo por parte del Honorable Señor Gobernador al Hon. Juez Guillermo Arbona Lago. La referida omisión puede ser la causa de futuros atentados contra la independencia de la Rama Judicial, ya sea en contra de los jueces en su carácter individual, ya contra dicha rama como institución.

Por último, disentimos por cuanto entendemos que, cuando menos, este Tribunal debió haber reconocido en forma expresa las cualidades profesionales y personales que adornan la persona del señor Juez Arbona Lago y debió haber recomendado a los Poderes Legislativo y Ejecutivo la renominación y confirmación del compañero Arbona Lago.

Las anteriores omisiones por parte de la "cabeza titular" de la Rama Judicial seguramente sumirán a nuestros jueces de instancia en un profundo estado de desasosiego e incertidumbre, lo cual desafortunadamente puede causar la desmoralización de la Rama Judicial a nivel de instancia, con el consiguiente perjuicio para el Pueblo de Puerto Rico.

—O—

Voto explicativo del Juez Asociado Señor Negrón García.

La independencia individual del juez es el secreto de su dignidad y la clave de una independencia judicial unificada. Los días y experiencias difíciles suelen traer, a modo de consuelo, una bondad fundamental. A causa del dolor que lo acompaña, a causa de las inquietudes que lo encierran, el espíritu esencialmente invencible del jurista hace de esas instancias reflexión y aprendizaje. Días que a veces se convierten en meses y años, cuando la conciencia —fiel y permanente compañera— nos invita a ahondar en los problemas, a indagar sus raíces y a encontrar soluciones. Y a cada frustración y desengaño en el desempeño del quehacer judicial, la conciencia nos devuelve con creces el esfuerzo, detrás del cual germina siempre la esperanza de una sociedad más justa.

En la Sagrada Escritura, Eclesiastés nos recuerda que "[h]ay un tiempo para cada cosa, y un momento para hacerla bajo el cielo". Eclesiastés 3:1. *La Biblia Latinoamericana*, 14ta ed., Madrid, Eds. Paulinas, 1972, pág. 877. Hay un tiempo de nacer, de vivir y de morir. También hay un tiempo

para sembrar y uno para cosechar. Pero sobre todo, hay "[u]n tiempo para amar y [luchar] . . . ". Eclesiastés 3:8. Íd. Este momento es la hora de luchar —con respeto, pero firmes— por lograr alcanzar hasta el máximo en nuestro sistema democrático la anhelada independencia judicial de carácter legal, funcional y orgánica, personal, administrativa y moral.

A ello ha respondido la resolución y los acuerdos del Tribunal. Al refrendar los mismos, conscientes y sensibles del momento histórico que vivimos, es oportuno dejar constancia de los fundamentos básicos que, a juicio nuestro, la sostienen. A fin de cuentas, si nos mantenemos con los esquemas del pasado habremos malgastado nuestra existencia. "Siempre será preferible exponerse a los transitorios extravíos propios de quien busca nuevas rutas, que la fácil marcha del que se resigna a seguir por la misma huella que otros dejaron; porque, según una feliz expresión de JOSÉ INGENIEROS, vale más que acertar en un responso de crepúsculo, equivocarse en una visión de aurora."[1]

I

*Antecedentes*

El trasfondo inmediato de nuestra resolución se remonta al viernes 8 de abril de 1988 en ocasión de la sustitución, antes de vencerse el término, del Juez Superior Hon. Guillermo Arbona Lago por el Gobernador de Puerto Rico, Hon. Rafael Hernández Colón. El 12 de abril el Juez Presidente Señor Pons Núñez públicamente consignó su preocupación y —entre varias importantes expresiones— dijo:

En el caso particular del Juez Arbona, por su claro, limpio y distinguido historial, la falta de explicación para su sustitu-

---

[1] J. Savransky, *Moral y economía notarial (reparto de la escritura oficial)*, Buenos Aires, Ed. Roque Depalma, 1957, págs. 24–25.

ción [—]combinada con determinaciones judiciales suyas desfavorables a organismos gubernamentales[—] da lugar a la especulación prevaleciente de que su sustitución obedece a recomendaciones y juicios [fundados] en criterios ajenos a las más sanas normas democráticas susceptibles a ser interpretados como atentatorios contra la independencia de criterio judicial. La separación de poderes exige el buen uso del poder para fortalecer y dar contenido a las instituciones. Los malos usos sólo tienen el efecto de debilitarlos y ponerlos en entredicho.

Ante la conjunción de circunstancias que rodean este caso en particular, a mi juicio es menester que se divulguen oficialmente por el señor Gobernador las razones que han dado lugar a apartarse de la norma que debe prevalecer de que en casos como el del Juez Arbona[,] la renominación debe ser regla. Otro proceder nos retrotraería a épocas pasadas, en distintas administraciones de gobierno, de triste recordación para la Rama Judicial y la democracia puertorriqueña. *Convoc. Sesión Especial Conf. Judicial*, 120 D.P.R. 838, 841 (1988).

El 14 de abril el Tribunal convocó esta Sesión Especial de la Conferencia Judicial de Puerto Rico sobre el tema de la independencia judicial. Unimos entonces un voto particular del cual, *in fine*, reproducimos:

Resquebrajada y desvalorizada la norma tradicional de renominación aludida —e inmolada la persona del Juez Arbona Lago— *incumbe a este Foro rescatar y devolver al resto de la magistratura puertorriqueña el sentido de seguridad y confianza de que subsiste la garantía e independencia judicial —libre de servilismo o condicionalismo— en su proyección tridimensional: legal, funcional y orgánica.* En esa misión, con carácter urgente, ha sido menester replantearnos las fallas existentes en el proceso de renominación según plasmadas en el informe del Secretariado de la Conferencia Judicial, *La Judicatura*, San Juan, octubre de 1981, pág. 73, con miras a superarlas, en particular, aquélla de que lo "único que está claro es que el juez depende exclusivamente *del favor del Primer Ejecutivo y está a merced de las fuerzas políticas* que puedan ayudar a mover la discreción de éste". (Énfasis

suplido.) La cuestión también ha requerido una convocatoria especial de la Conferencia Judicial para cubrir otros extremos germanos.

La Resolución adoptada hoy recoge el sentir unánime institucional y representa —irrespectivo del desenlace del proceso de sustitución a que ha sido sometido el Juez Arbona Lago— un paso más que abona a "la independencia del [p]oder [j]udicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática". Canon XIII de Ética Judicial, 4 L.P.R.A. Ap. IV-A. (Énfasis suplido y en el original.) *Convoc. Sesión Especial Conf. Judicial*, supra, pág. 846.

Subsiguientemente, el 13 de julio, mediante segunda resolución, fueron fijadas las fechas de la conferencia y el ámbito de la encomienda del comité designado.

## II

*Método de selección de jueces*

En su desenvolvimiento final dentro del sistema constitucional y normativo, es obvio que la principal razón de ser del Poder Judicial es la de adjudicar casos y controversias, esto es, hacer justicia. Por ello cada sentencia, dictamen o actuación judicial —como operación humana de inteligencia y voluntad— valdrá lo que el juez valga como hombre en su más profundo significado intelectual y moral. Esta simple proposición desemboca en una conclusión de trascendental significado: la suerte de la justicia dependerá del sistema de selección de estos hombres. Si la ley permite elegir hombres buenos, competentes y justos, la justicia será buena; por el contrario, si la ley autoriza a elegir hombres malos, ineptos o arbitrarios, la justicia será mala.

La existencia de buenos jueces incide en factores tales como el método de selección, el régimen de su permanencia en el cargo, la retribución, el sistema de retiro, las responsabilidades asignadas, los impedimentos, etc.

Al presente, es unánime el clamor por una mejor justicia y, por ende, de una mejor Judicatura. Si el país no está con-

forme con su calidad, si los Poderes Ejecutivo y Legislativo desean mejorarla, es obvio que el método de selección del pasado, en su funcionamiento, no ha sido el mejor. La insatisfacción histórica es materia de conocimiento general. También, la erosión experimentada "en los últimos años, atribuible quizás a una exacerbación y predominio, en grado antes no visto, del elemento partidista". *Voto explicativo preliminar del Juez Asociado Señor Negrón García*, 48 (Núm. 2) Rev. C. Abo. P.R. 139, 145 (1987). Allí consignamos:

Desde esta perspectiva, expuesto[s] a que se nos tache de heterodoxo[s] o al riesgo de una malsana intrepretación, no creemos posible aislar totalmente el elemento político-partidista en los nombramientos judiciales. No podemos olvidar que dicho esquema constitucional está afianzado en la hipótesis de la más balanceada distribución de poderes entre sus tres ramas —Ejecutiva, Legislativa y Judicial— como factor "saludable y necesario para mantener una verdadera democracia, evitando así una excesiva concentración en una de ellas, con los peligros que ello conlleva". *Negrón Soto* v. *Gobernador, supra*, 668. Precisamente, sobre el método constitucional prevaleciente, en este último caso afirmamos:

"Independientemente de su sabiduría, (4) pero formulado precisamente en la doctrina de frenos y contrapesos antes expuesta, la Asamblea Constituyente, previo extenso debate, optó por disponer que los 'jueces [fueran] nombrados por el Gobernador con el consejo y consentimiento del Senado . . . ', y que sus términos fueran fijados por ley. La Ley de la Judicatura proveyó el término de doce y ocho años para los jueces Superiores y de Distrito, respectivamente. 4 L.P.R.A. secs. 92 y 152".

Y al escolio cuatro (4) expusimos:

"El peligro de concentrar demasiado poder en una rama de gobierno es evidente. La designación y nombramiento de los jueces exclusivamente por el Poder Judicial, *sin la intervención de los otros Poderes*, como se ha sugerido, podría crear una 'hegemonía de magistrados' o 'magistrarcado', con personas que se renovarían automáticamente sin estar sujetas al escrutinio de funcionarios electos en comicios pe-

riódicos. Por otro lado, [e]s incuestionable que mientras mayor sea el término de duración de un juez en su cargo, menos intervenciones ajenas habrá que afecten la imparcialidad e independencia judicial que debe permear y caracterizar un sistema judicial. La estabilidad que tales términos imprimen y la ausencia de las presiones psicológicas que la renovación del término de juez conlleva, son fundamentos suficientes para favorecer tal enfoque.

"No obstante, preciso es ponderar que ciertos períodos muy extensos y los cargos [de] por vida —*sin el diseño de mecanismos apropiados que permitan la revisión y evaluación de los incumbentes, y su separación del servicio por causas no autorizadas al presente*— puede[n] propiciar que se mantengan en sus cargos personas incompetentes o cuyo estado físico o mental le[s incapacite] para continuar el mismo. Cualquiera recomendación debe contemplar el *establecimiento de la carrera judicial, un balance razonable entre términos extensos, que en el proceso de renominación de un juez no intervengan consideraciones político-partidista[s], y la creación de mecanismos adicionales de separación del cargo por causas justificadas. Informe sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico por la Comisión para el Estudio de los Tribunales, ante,* págs. 108–109."

Esta realidad no debe nublar nuestra óptica. El elemento político[-]partidista, *per se* no es perjudicial, si la persona seleccionada es idónea, está capacitada y posee al nivel deseado las cualidades de buen juez antes expuestas. El pasado y presente da lustre y prestigio a la judicatura personas que ingresaron directamente a la Rama Judicial desde los ambientes de la Asamblea Legislativa y el Ejecutivo, y desempeñaron imparcialmente y con ecuanimidad sus cargos. (Énfasis suplido.) *Voto explicativo preliminar del Juez Asociado Señor Negrón García,* supra, págs. 145–146.

En la medida en que una comisión asesora para nombramientos judiciales puede contribuir al mejoramiento y selección de jueces, la resolución del Tribunal así lo reconoce al proponer legislación de índole *interina* y con carácter persuasivo. No ha sido posible promover legislación que im-

ponga compulsoriamente al Primer Ejecutivo el deber de honrar y seleccionar los candidatos que solamente produzca dicha comisión. Aunque ese es el ideal, en ausencia de una enmienda constitucional, toda medida que estatutariamente intente imponer al Primer Ejecutivo el criterio del comité asesor podría entenderse como una limitación a su amplio poder de nombramiento previsto por la Constitución.[2]

¿Es posible tal restricción? El vocablo *asesor* implica "tomar consejo una persona de otra, o ilustrarse con su parecer". *I Diccionario de la Lengua Española*, (1980), pág. 138. Sabemos que el único asesoramiento visualizado en la Constitu-

---

[2] Conscientes de ello, en nuestro voto particular expusimos:

". . . [S]egún el diseño constitucional vigente, no cuestionamos la prerrogativa del Primer Ejecutivo en cuanto a la renominación de los jueces, compartida por el Senado de Puerto Rico. Reafirmamos nuestra deferencia hacia ambos poderes. Pero el ejercicio *discrecional* de esa prerrogativa, aun cuando de su faz es absoluto, no puede significar que sea arbitrario. '[E]l concepto discreción, aun con referencia a una potestad de abolengo constitucional que no está específicamente reglada, necesariamente ha de nutrirse de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna. Como fuente integral del proceso de decisión que contribuye a dar sentido a la ley y a concretar en la realidad derechos individuales y colectivos, el uso por excelencia de un poder discrecional, intenta establecer un balance moral entre los polos opuestos en que se debaten algunas de las controversias humanas: el bien y el mal; la juridicidad y la violencia; la legalidad aparente y la ventaja indebida; lo prudente y lo irrazonable; la paridad y la desigualdad; lo espiritual y lo material; lo racional y lo pasional; y, la opresión y la libertad.' *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 770 (1977), opinión concurrente.

"Resulta un rezago jurídico que inexplicablemente el Poder Ejecutivo niegue consecuencias a, y anule la eficiencia e independencia del sistema de administrar justicia, *apartándose del precepto de ley no escrita y tradicional, de avalar con sus renominaciones*, jueces íntegros, competentes y de prístina solvencia moral y ética, por la sola razón de que la Constitución no fijó expresamente unos criterios para que el ejercicio de esa facultad ejecutiva pudiera manifestarse. Ciertamente el derecho a nombrar y renominar los jueces no debe hacerse depender del grado de eficiencia con que se redacte una constitución. Conocido el espíritu y objetivo de independencia judicial que inspiró nuestra Ley Fundamental, los tres poderes constitucionales debemos hacer causa común y realidad su propósito fundamental, evitar nocivos precedentes que no sólo resultan arcaicos en nuestro tiempo, sino atentatorios al estado actual de nuestra conciencia generacional." (Énfasis en el original.) *Convoc. Sesión Especial Conf. Judicial*, 120 D.P.R. 838, 843–844 (1988).

ción es el dimanante vía consejo y consentimiento del Senado. Esta mecánica constitucional de poderes divididos entre el Ejecutivo y el Senado explica por qué hasta el presente, todos los comités asesores bajo los Gobernadores, Sres. Roberto Sánchez Vilella (1965–1968), Luis A. Ferré (1969–1972), Rafael Hernández Colón (1973–1976)[,] Carlos Romero Barceló (1977–1984) y Rafael Hernández Colón (1985– ), han funcionado esencialmente sobre unas bases estrictamente voluntarias. Bajo las actuales coordenadas constitucionales, ¿podría ser de otro modo? Ante estas interrogantes, es debatible por no decir dudoso, que una Asamblea Legislativa pueda por ley *compeler a un futuro gobernador* a compartir una prerrogativa que sólo viene obligado a hacerlo con el Senado. Como corolario, tampoco ninguna legislación podría condicionar a un Gobernador de su libertad de retener o sustituir los miembros de ese Comité Asesor. Esta última circunstancia inyectaría el elemento de falta de continuidad en su composición. Además, después de cada elección se produciría el mismo fenómeno político-partidista de cambio que acontece a nivel de miembros del Gabinete, otros puestos jerárquicos y de confianza en diversas agencias y comisiones. Lógica y razonablemente cualquier Gobernador habrá de desear que sus asesores sean personas de su confianza o en comunión con los delineamientos ideológicos de su programa de administración.

En reconocimiento de esta realidad constitucional, en un equilibrio de los intereses envueltos y tomando como punto de partida las pautas históricas y el caudal de experiencias, el *Informe de la Comisión para el Estudio de los Tribunales del Consejo sobre la Reforma de la Justicia* recomendó como única opción posible que se "ele[va]ra a rango constitucional el Comité Asesor, y mediante legislación suplementaria" se reconociera la autoridad nominadora del Primer Ejecutivo y la facultad de confirmación o rechazo del Senado. *Informe al Consejo sobre la Reforma*, Vol. I (1974), pág. 122. (Énfasis suplido y escolio omitido.) *Voto explicativo preliminar del Juez Asociado Señor Negrón García*, supra, págs. 146–147.

Esta alternativa y sus fundamentos los recoge satisfactoriamente nuestra resolución.

## III

*Término de nombramiento*

El Tribunal ha adoptado, como único método que propicia al máximo la independencia judicial en su proyección multi-dimensional, el *nombramiento inicial* de todos los jueces por un prudencial periodo fijo, y después uno sin término, mientras desempeñen fielmente los deberes del cargo y observen buena conducta. De ese modo proclamamos sin vacilaciones la insatisfacción que voces autorizadas del pasado y del presente han expuesto.

No es menester detallar las experiencias de los casos de prestigiosos miembros de la Judicatura que han sufrido las injusticias del actual sistema. Ayer fue el Juez Superior Ramón Negrón Soto; hoy, el Juez Arbona Lago. Aún así, algunos aconsejan nuevos estudios. Se aduce que el sistema actual es adecuado, pues estadísticamente los jueces han sido renominados y, salvo instancias mínimas —en virtud de ese mecanismo y práctica— el término en esa etapa en realidad se convierte en indefinido. En principio, no negamos esa proposición.

Sin embargo, no se trata de si el actual sistema ha permitido elegir buenos o malos candidatos. En términos generales, puede afirmarse que el actual sistema ha elegido buenos candidatos, aunque no en la proporción deseada. Pero lo cierto es que a tales designaciones se ha llegado después de penosas experiencias,(3) trámites y debates de ante-

---

(3) "Indagaciones por parte de funcionarios gubernamentales (legislativos o políticos) y hasta por aquellos que ostentan su representación o hacen alarde de su amistad, sobre el estado de algún caso; solicitudes o gestiones de empleo en los tribunales para parientes y familiares; cuestionamientos sobre la forma o resultado de una determinación judicial, son algunos de los ejemplos que reflejan el ejercicio de presiones o influencias indebidas sobre los jueces.

"Debe mencionarse, además, que existe un riesgo real de conflicto de intereses en la evaluación para renominación de jueces que se le solicita al Colegio de Abogados, cuando todos los evaluadores son abogados postulantes sujetos a en-

sala —en oficinas legislativas y ejecutivas— en las cuales las virtudes de los jueces, sus aptitudes personales, *sus creencias, identidades y afiliaciones político-partidistas* han sido el objeto principal de toda suerte de apreciaciones. De ese modo, se ha sometido a los jueces a la "presión del ingrediente político-partidista . . . en grado cada vez mayor".

Las consecuencias negativas son obvias. Se encuentra el juez enfrascado en una lucha por su renominación; deja de ser juez para transformarse en defensor de sus propias virtudes. Según el esquema vigente, el problema del régimen de independencia no sólo es de ingreso al servicio, sino que se agudiza en las fases de renominación o continuidad y ascenso en el servicio. El fenómeno político-partidista incide perniciosamente, no tanto en su nombramiento original, sino en el de su retención o promoción. La razón es sencilla: un juez, fiel a sus deberes, puede decidir un asunto contra los intereses del Secretario de Justicia que lo recomendó o del Gobernador que lo nombró. Pero ese mismo juez, ¿tendrá siempre el valor y las fuerzas suficientes para fallarle en contra al Secretario de Justicia o al Gobernador, a quienes les corresponde intervenir en su renominación o decidir si es ascendido o no? Con máximo dramatismo, ¿qué efectos desmoralizantes sobre otros jueces —atentatorios contra la independencia— tendría la decisión pública de un Primer Ejecutivo al no renominarlo? Los riesgos de ese sistema son evidentes: se desmoraliza la justicia y se aniquila la libertad.

El problema eterno de la independencia judicial es político. Sólo cuando el juez es independiente *la justicia queda servida por sí misma.* Ciertamente, si no es independiente, podrá eventualmente servir a la justicia, pero la servirá por

---

contrarse ejerciendo ante aquéllos a quienes evalúan. Esta situación constituye un elemento de coacción constante, que se acentúa más aún en las regiones judiciales pequeñas. El proceso obligatoriamente afecta la apariencia de imparcialidad." Informe de la Conferencia Judicial, San Juan, Secretariado de la Conferencia Judicial, octubre de 1988, págs. 155–156.

algo que no le pertenecía a la justicia misma, a saber: temor, interés, amor propio, gratitud, honores, publicidad, etc. Huelga decir que ese estado de cosas configura el supremo desmoronamiento de las garantías constitucionales y queda en jaque toda protección ciudadana. La Constitución sólo vive por la aplicación viril e imparcial de los jueces; si desfallecemos, deja de existir.

## IV

*Evaluación de los jueces*

La premisa cardinal que anima la creación e implantación de un sistema de evaluación de los miembros de la Judicatura es que la variable fundamental en toda estructura judicial es el juez. De la integración y su compromiso con los objetivos y fines del cargo dependerá la calidad del producto elaborado: la sentencia. La capacitación permanente de ese elemento humano mediante una *educación continuada* que lo mantenga al tanto de los cambios y unas evaluaciones periódicas directas por un organismo bajo la tutela del Tribunal Supremo serán los motores de cuya eficiencia dependerá una mejor administración de la justicia. Estos mecanismos de control —con exclusión del jurisdiccional— tienen la finalidad esencial de mantener su vitalidad funcional. Sin este control —que no es sinónimo de vigilancia— no hay evaluación posible. Y, sin información, cualquier evaluación es utópica.

El establecimiento del sistema evaluativo no debe generar temor entre los miembros de la Judicatura. En última instancia, quien no posea verdadera vocación judicial y espíritu de sacrificio no debe formar parte de sus filas, y si ya estuviere en ellas, debe tener el valor de marcharse.

El sistema de evaluación parte de un reconocimiento de las deficiencias de la función judicial. Algunas tienen causas propias y otras ajenas. "Por la naturaleza variable del ser

humano en el curso de su efímera existencia, hemos de aceptar que ningún método de selección de jueces es perfecto ni constituye garantía infalible contra la designación de personas no aptas. 'La fluidez y cambios no controlables y anticipables que experimenta la naturaleza humana en cuanto a personalidad, actitudes de trabajo, conducta, estudio y grado de responsabilidad, difícilmente permiten lograr una proporción absoluta y total en cuanto a certeza y corrección de los nombramientos. No obstante, el criterio rector es que el sistema debe ser uno afirmativo y positivo que tienda [a] atraer a la judicatura regularmente el mejor talento jurídico'. *Informe al Consejo sobre la Reforma, ob. cit.,* pág. 111." *Voto explicativo preliminar del Juez Asociado Señor Negrón García,* supra, pág. 144.

Esta realidad y el deber de información a la ciudadanía proyectan el reverso de la medalla de la independencia: la responsabilidad. La cara es la independencia; la cruz, la responsabilidad. Pero sobre todo, la responsabilidad de conciencia. En la Rama Judicial deberían estar los mejores abogados con vocación. La evaluación forma parte del poder disciplinario, que deberá ser un estímulo. Requerirá de este Foro mayor actividad que la que ocurrió en el pasado para lograr, en tan alto Ministerio, dedicación exclusiva, estricta puntualidad y atención esmerada con los profesionales y con el público en general. Todo el sistema judicial está al servicio de la comunidad y debe así entenderse. La política de ver y callar nunca rinde frutos. Las verdades hay que decirlas.

## V

*Funciones no judiciales de los jueces*

La resolución de hoy reconoce las raíces históricas que han justificado la carga adicional que recae sobre la Judicatura del país: las funciones en organismos electorales locales. Su permanencia es un tributo a la honestidad e integridad de

sus miembros. Coincidimos que debe reexaminarse esta práctica, cuyo mayor reparo es que afecta y es en detrimento del tiempo a dedicarse a las labores judiciales.

Sin embargo, creemos que la naturaleza *casi sagrada* del procedimiento electoral exige que sus organismos sean presididos por personas libres de toda sospecha, duda o presión, y que el sistema represente la mayor pureza procesal. En este sentido, las enmiendas en los términos de duración en los cargos de los jueces contribuyen y afianzan ese legítimo reclamo.

Anticipamos que toda objeción, fundada sobre la actual práctica de presidir las comisiones locales electorales, puede superarse si a esa tarea —que hoy *no es judicial*— mediante legislación expresa, se le imparten todas las características de una función de naturaleza judicial. Bajo este enfoque, las intervenciones de los jueces en esas comisiones dejarían de ser meramente ejecutivas y administrativas. Toda determinación tendría el imprimátur de una adjudicación judicial. Las variantes procesales que necesitaren ajustarse a ese diseño podrían implantarse mediante enmiendas legislativas a la Ley Electoral de Puerto Rico.

## VI

*Reflexiones finales*

Para finiquitar, hemos de señalar que esta Conferencia Judicial es un tributo vivo a la persona del Juez Arbona Lago quien —citando a Carlyle— en abono de la independencia judicial, ha sido la "fuerza más profunda[;] es la más silenciosa". "¡Cuánto conoce y cuánto calla un juez! . . . ¡Si en alguna ocasión habla en tono severo, cuánto habrá debido callar antes en obsequio de momentos que juzgó inoportunos para traducir su indignación!" L.M. Boffi Boggero, *Reflexiones sobre el Poder Judicial*, 1978-B Rev. Jur. Arg. La Ley 849 (1978).

Hoy, nuevamente a "raíz de la solemnidad de la ocasión, de inmediato recordamos que a 'través de su extendida historia el Poder Judicial exhibe héroes y hasta mártires', Boffi Boggero, [*supra*], pág. 851. Sentimos una frustración de espíritu, de cómo, paradójicamente, 'la lógica del sistema se quiebra, el valor implícito de la vida democrática se desmorona, las creencias se esfuman y se cumple aquello de que *"cuando se fue la justicia nos quedaron las ceremonias"*'. A. Mooney, *La elección del Poder Ejecutivo nacional (legalidad versus legitimidad)* 1985-E Rev. Jur. Arg. La Ley 545 (1985)". (Énfasis suplido.) *Voto explicativo preliminar del Juez Asociado Señor Negrón García,* supra. "Dios quiera que su ejemplo peraltado ilumine a quienes desean preservar y acrecer una de las más altas dignidades de la criatura humana. . . ." Boffi Boggero, *supra,* pág. 851.

Sólo nos resta añadir que comprendemos el desaliento de quienes miden la longitud y los obstáculos que nos presenta el camino a correr. No pasamos por alto que los seres humanos hemos adquirido más progreso en el mundo de la tecnología que en la elevación moral. Aún así nos anima la esperanza de que los Poderes Ejecutivo y Legislativo, previa determinación, acojan favorablemente estos reclamos del Tribunal. Después de todo, el "pesimismo no es un punto de llegada, sino un camino. Es preciso pasar por él, pero justamente para salir de él". M. Iglesias Corral, *El Enigma del Derecho, Libro-Homenaje a Ramón María Roca Sastre,* Madrid, Ed. Gráficas Cóndor, 1976, Vol. I, pág. 71.

—O—

Voto particular emitido por el Juez Presidente Señor Pons Núñez.

San Juan, Puerto Rico, a 25 de octubre de 1988

En vista de los votos emitidos por los compañeros Jueces de este Tribunal en torno a la resolución adoptada por el Tri-

bunal el 10 de octubre de 1988, he decidido emitir este voto en donde recojo las expresiones que hiciera el 6 de octubre de 1988 al declarar constituida y abierta esta Sesión Especial de la Conferencia Judicial.

Creo oportuno hacerlo, pues esas expresiones revelan el marco conceptual en que concebí y concibo la adopción de esa resolución que contiene el planteamiento más integral y comprensivo jamás articulado por la Rama Judicial en torno al tema de la independencia judicial.

.Manifesté entonces y ratifico ahora, en lo pertinente, lo siguiente:

Hay momentos en la vida de los hombres y de los pueblos en que se hace imperativo puntualizar el deber ser. Este es uno de esos momentos para el sistema judicial. Imperativos circunstanciales nos obligan a reflexionar sobre los valores que constituyen la savia de que se nutre el sistema. Al hacerlo tenemos que estar dispuestos a cambiarlos o a reafirmar los que se tienen aunque el cambio resulte en nuevos retos o la reafirmación acarree señalar una y otra vez lo que debe resultar obvio. Como hombres y mujeres libres esa es la responsabilidad que nos corresponde y que asumimos sin vacilación. En el descargo de esa responsabilidad hay mucho de misión. No permitamos que se convierta en mero ejercicio rutinario o prosaico.

No estamos hoy aquí en una gestión de defensa gremial. Esa defensa tiene también su propio valor y sitio, pero no es nuestra misión en esta Conferencia. Estamos en una gestión patriótica de fortalecimiento de nuestras instituciones y de nuestra democracia. Gestiones en torno a otros justos reclamos debemos hacerlas en otra ocasión, pues ahora sólo servirían para que espíritus prevenidos traten de debilitar la nobleza del propósito que nos anima.

Como he señalado antes, la ausencia de independencia judicial, afecta tanto a la administración de la justicia en casos particulares como a la función de la Rama Judicial dentro de un sistema de gobierno fundamentado en la doctrina de la separación de poderes. La preservación de esa independencia constituye un valor objetivo primordial, personal y colectivo

de los jueces, pues es un mandato ético gubernamental que nos impone el Canon XIII de los de Ética Judicial al señalarnos que: "Los Jueces deben proteger y promover la independencia del poder judicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática." [4 L.P.R.A. Ap. IV-A.] Porque acatamos ese mandato ético gubernamental y por imperativo de nuestras conciencias de hombres y mujeres libres es que hemos defendido en el pasado y continuaremos promoviendo, decididamente, la independencia del Poder Judicial.

Pero ese mandato nos impone grandes responsabilidades. Entre ellas es reconocer: Primero, que en nuestro sistema las tres ramas de gobierno están concebidas para servir al pueblo y que en la medida que no lo hacen pierden legitimidad. Segundo, que estos tres poderes no están concebidos para eregirse uno sobre los otros ni para desdeñar una la función y los componentes de los otros. Tercero, que la única manera que nuestro pueblo puede asegurarse de que cada una de las ramas de gobierno cumple su función y misión de servir es mediante una enérgica y prudente fiscalización por parte de las otras; y digo *fiscalización* y no *intervención*, pues, la primera es legítima y la segunda no lo es. Cuarto, que las distintas ramas de gobierno tienen la obligación y responsabilidad de cooperar entre sí en todo aquello que les sea propio. Quinto, que los jueces tenemos que velar por que esa independencia judicial no sirva para escudar nuestras deficiencias ni para esconder actuaciones impropias tales como el comienzo tardío de las sesiones en los tribunales, las suspensiones innecesarias, el maltrato de testigos y la insensibilidad a sus problemas y así sucesivamente. Sexto, que a los jueces nos toca proteger y defender nuestros principios con mesura, serenidad, decoro, dignidad, sin personalismos, sin estridencias ni destemplanzas y haciendo caso omiso a los ataques personalistas.

Hay, sin embargo, un factor que creo debemos tener siempre presente en nuestras deliberaciones y que distingue significativamente nuestra Rama de gobierno, especialmente cuando reclamamos independencia. El Poder Judicial no está sujeto a ser evaluado por la comunidad directa y periódicamente como lo están los poderes ejecutivo y el legislativo a

través de las elecciones. La fiscalización que hace la comunidad de la Rama Judicial es indirecta porque la hace por conducto del Ejecutivo y Legislativo.

Esta situación crea en la comunidad un mayor sentido de frustración, de impotencia, ante los errores que entiende o comete el Poder Judicial, especialmente si se percibe que su servicio a la comunidad no es lo adecuado que debe ser. Ello obliga a la Rama Judicial a una mayor auto-fiscalización, sensibilidad y aceptación de la crítica justa. A las otras ramas de gobierno las obliga a una fiscalización más discerniente. Y digo más discerniente porque el que la fiscalización de la Rama Judicial no sea por conducto de las elecciones tiene una importantísima razón de ser que todos aquí conocemos y es de la esencia de la independencia que reclamamos. Si la fiscalización no es discerniente pierde legitimidad y se convierte en intervención que enerva la independencia judicial. Es para tener la fuerza moral necesaria para rechazar la intervención, que tenemos que cuidarnos de no utilizar la independencia judicial como escudo para evitar la fiscalización.

Los exhorto a que reflexionemos seria y profundamente sobre estos asuntos tan vitales para la Rama Judicial y para la democracia puertorriqueña que hemos de tratar en estos días.

A mi juicio debe quedar diáfanamente claro que la discusión de estos temas y la defensa de los principios que le dan cuerpo al Poder Judicial no significa enfrentamiento y tampoco debe significar confrontación, atendiendo a la carga semántica distinta que tienen ambos vocablos. Por el contrario, lo que debe imperar en nuestras deliberaciones es el sentido de diálogo y de comunicación franca y sosegada, rechazando a todo aquél que con propósitos ilegítimos intente convertir en fuego el calor de una discusión de altura, a todo aquel que en lugar de blandir las armas del intelecto y de la razón eche mano de la palabra que destruye, de la intención aviesa o de la sinrazón.

Pero es también importante que la serenidad, la mesura y la suavidad que nos proveen una conciencia tranquila no se confunda con debilidad o falta de voluntad. Fieles a nuestro deber, continuaremos, como hasta ahora, impertérritos, defendiendo y adelantando, aquí y donde sea menester, los principios que son nuestra razón de ser con las luces del entendimiento que la naturaleza nos ha provisto.

Procedamos, pues, en paz con nuestras conciencias, con el recto cumplimiento con nuestro deber y como dijera aquél gran libertador, quien antes fue abogado, "sin maldad en nuestro corazón, compasivos con todos y con la firmeza que provee lo justo . . . cuidando de los que han soportado la lid . . ." de suerte que las generaciones que nos han de suceder puedan reconocer que cumplimos con nuestro deber. Mensaje del Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. Víctor M. Pons Núñez, Sesión Especial de la Conferencia Judicial de Puerto Rico, 6 de octubre de 1988.

Como he señalado al comienzo de este voto, las anteriores expresiones fueron hechas con anticipación a todas las otras expresiones que han hecho mis compañeros Jueces en sus votos particulares. Las ratifico hoy porque tienen la misma vigencia de entonces y, desde mi perspectiva, proveen un marco de referencia adecuado para entender el ánimo con que me dediqué a la tarea de promover el fortalecimiento de la independencia judicial y los fines que he perseguido con la adopción de la Resolución de 10 de octubre de 1988.

No hemos de tornar nuestras esperanzas en asperezas, y con el mismo ánimo y propósitos perseveraremos.

—O—

Voto particular del Juez Asociado Señor Ortiz.

A los fines de impartirle formalidad a las expresiones orales que vertiera en la última sesión de la Conferencia Judicial, procedo a reproducir la esencia de las mismas.

En la ponencia del Juez Asociado Señor Rebollo López se señala:

El Poder Judicial es un solo cuerpo. La acción de sustituir al compañero Arbona Lago constituye un intento de cercenar una parte saludable y llena de vida de ese cuerpo judicial. Sorprende, en su consecuencia, que la cabeza de ese cuerpo judicial —el Tribunal Supremo— no se exprese en el día de hoy en evitación de esa amputación. Causa, cuando menos, tristeza en nuestro espíritu que tras varios meses de intensa labor por

parte de ese distinguido Comité Asesor sobre Independencia Judicial este Tribunal, en la resolución mayoritaria que emite, ni tan siquiera mencione que el Honorable Arbona Lago es un juez competente y calificado que merece ser renominado por el Poder Ejecutivo para un nuevo término. Opinión disidente del Juez Asociado Señor Rebollo López, pág. 444.

La razón principal por la que estuve conforme con la resolución adoptada es que la única oración que se subrayó y se le dio énfasis lee: *"Hoy el Tribunal reitera y reafirma su pronunciamiento de 14 de abril de 1988."* (Énfasis en el original.) Resolución, pág. 420.

Esa reafirmación constituye un juicio claro de la posición y el sentir del Tribunal sobre las calificaciones del Honorable Juez Arbona Lago.

—O—

Voto particular del Juez Asociado Señor Alonso Alonso.

La desacertada e incorrectamente titulada opinión disidente del Juez Asociado Señor Rebollo López me motiva a exponer una síntesis del trasfondo conceptual y valorativo que animó mi consciencia al suscribir la resolución de este Tribunal de 10 de octubre de 1988, que trata sobre la independencia judicial, cuyo trasfondo trasciende el ámbito de los tribunales y del sector público. Reitero así mis expresiones conceptuales y valorativas expuestas en mi opinión disidente en *Merheb v. Benero Natal*, 119 D.P.R. 508 (1987).

Lo hago convencido de que la resolución es un acto histórico que reafirma el compromiso inquebrantable de este Tribunal con la verdad, la libertad, la justicia, el respeto y la defensa que merece la dignidad del ser humano y sus instituciones sociales.

La resolución constituye además un acto institucional positivo, creativo y representativo de los valores más preciados de la sociedad contemporánea con proyección futura, no sólo

para beneficio de la Rama Judicial y de la democracia, sino para el enaltecimiento de atributos del hombre tales como: la libertad, la dignidad, la humildad, la honradez, la sensibilidad, la respetuosidad, la laboriosidad y la generosidad.

El devenir histórico de la civilización occidental que hemos heredado desde las épocas grecoromana, medieval y, particularmente, durante los acontecimientos ocurridos en los siglos 17 y 18, con sus aciertos y errores, ha mantenido un continuo valorativo que se ha transmitido de generación en generación, el cual se ha plasmado en derechos inalienables del hombre; derechos que recoge nuestra Constitución.

Estos valores y derechos han sido defendidos y propugnados durante siglos por hombres comprometidos con la búsqueda de la verdad, la defensa de la libertad, así como con la dignidad del ser humano y de las instituciones que le sirven y ayudan a convivir con otros en paz y armonía. La experiencia nos enseña que a estos hombres les caracteriza la seguridad en sí mismos, la valentía, la autoestima, su enfoque positivo, su enorme fe y esperanza, y sobre todo el gran sentido de sacrificio personal y de humildad. Su defensa no sólo ha sido enarbolada desde el servicio público, sino desde todas las esferas del quehacer humano.

La sociedad contemporánea y del futuro requiere que mantengamos esta perspectiva histórica y abarcadora para que los seres humanos que son sus protagonistas principales mantengan su brújula apuntando al destino y a los valores correctos, aun cuando el mar en que navegan sea tormentoso y pretenda sacarlos de curso.

Los que al asumir cargos públicos juran defender la Constitución del Estado Libre Asociado de Puerto Rico y la de Estados Unidos de América hacen un compromiso con la defensa, entre otros, de valores y derechos como la dignidad del ser humano y el respeto a las instituciones que le dan vida al sistema democrático de gobierno.

Flaco servicio se le hace a la democracia, a sus institu-
ciones y a la dignidad del ser humano con críticas que menos-
caban los valores e instituciones fundamentales. Para que
una civilización sea de excelencia, las actuaciones y la crítica
de los hombres debe ser constructiva y edificante, cimentada
en un fundamento de buena fe y de respeto a su prójimo. Lo
contrario menosprecia los valores que durante siglos los
seres humanos han enaltecido y defendido hasta con sus pro-
pias vidas.

Tanto la resolución aprobada por este Tribunal, el In-
forme del Comité Asesor sobre Independencia Judicial nom-
brado por el mismo el 13 de junio de 1988 para estudiar la
independencia judicial, así como la resolución de este Tribu-
nal de 14 de abril de 1988 que acoge las expresiones públicas
del Juez Presidente, constituyen un esfuerzo solidario de na-
turaleza edificante dentro del marco conceptual y valorativo
aquí expresado. Este esfuerzo tiene un sólido sustrato de
buena fe. Así debe ser examinado por todos los integrantes
de nuestro complejo sistema social.

—O—

Voto particular emitido por el Juez Asociado Señor Hernán-
dez Denton.

San Juan, Puerto Rico, a 26 de octubre de 1988

Preocupados por que el voto disidente del compañero
Juez Asociado Señor Rebollo López pueda tener el efecto
indeseable de desvalorizar la resolución de 10 de octubre de
1988 adoptada por este Tribunal al concluir la Sesión Extra-
ordinaria de la Conferencia Judicial, hemos decidido unir
este voto de conformidad a dicho acuerdo. Lo hacemos al
amparo de la Regla 4(b) de nuestro Reglamento, 4 L.P.R.A.
Ap. I-A, pues su disenso fue circulado apenas dos (2) horas
antes del inicio de la clausura de la Conferencia y hasta ese

momento ninguno de los restantes miembros del Tribunal estábamos informados exactamente de cuál era su posición u objeciones a los acuerdos del Pleno celebrado el sábado 8 de octubre de 1988.

Aclaramos, sin embargo, que suscribimos tanto la ponencia del Juez Asociado Señor Negrón García como las expresiones del Juez Asociado Señor Ortiz al concluir la sesión. De esta manera reiteramos nuestro endoso a la decisión del Tribunal y aprovechamos para poner en su justa y verdadera perspectiva los excelentes trabajos preparativos y las deliberaciones de la Conferencia.

I

Por primera vez en la historia constitucional de nuestro país convocamos una Sesión Especial de la Conferencia Judicial para examinar el concepto de la independencia judicial en su más amplia dimensión. Así respondimos a los reclamos de la Judicatura puertorriqueña a raíz de la sustitución del Juez Superior Hon. Guillermo Arbona Lago y nos solidarizamos con las declaraciones públicas del Juez Presidente Señor Pons Núñez que expresan sus inquietudes respecto al ejercicio del poder constitucional del Gobernador en ése y otros nombramientos.

Posteriormente, el 13 de julio de 1988, designamos un Comité Asesor sobre Independencia Judicial (Comité Asesor) compuesto por diecinueve (19) distinguidos togados —entre ellos, siete (7) jueces— [1] y fijamos el alcance de la encomienda:

---

[1] La integración de los miembros del Comité Asesor sobre Independencia Judicial fue la siguiente:

De acuerdo con la resolución de este Tribunal de 14 de abril de 1988, el tema de Independencia Judicial ha de tratarse en su más amplia dimensión por lo que no ha de limitarse a las alternativas viables dentro del Sistema Constitucional vigente sino que han de explorarse también alternativas que requieran cambios constitucionales. Dentro de ese amplio marco de referencia se han de tratar principalmente las siguientes cuestiones:

a. El concepto de la independencia judicial a la luz de la Constitución del Estado Libre Asociado y de la legislación vigente, incluyendo el estudio sobre las obligaciones éticas que van unidas a la independencia judicial y perfeccionamiento del principio de neutralidad política de la judicatura.

b. Criterios y métodos para la selección y nombramientos de jueces del Tribunal de Primera Instancia y el término de duración de los nombramientos.

c. Sistema de evaluación judicial y proceso de renominación de jueces.

d. Autonomía presupuestaria de la Rama Judicial y su impacto sobre las condiciones de trabajo de los jueces. Este tema también abarcaría la autonomía administrativa de los recursos fiscales. Resolución de 13 de julio de 1988.

---

Lcdo. Rubén Rodríguez Antongiorgi, Presidente
Hon. Miguel A. Rivera Arroyo
Hon. Abner Limardo Sánchez
Hon. Ángel F. Rossy García
Hon. Pedro López Oliver
Hon. Ángel G. Hermida
Hon. Fernando Gierbolini Borelli
Hon. William F. Santiago Vázquez
Lcda. Judith Berkan
Lcdo. Carlos Ríos Gauthier
Lcdo. Noel González Miranda
Lcdo. Benjamín Rodríguez Ramón
Lcdo. Samuel Céspedes
Lcdo. Manuel Martínez Umpierre
Lcdo. Salvador Antonetti
Lcdo. José Enrique Otero
Lcdo. Raúl González Díaz
Lcda. Maggie Correa
Lcda. Maricarmen Ramos de Szendrey

El 20 de septiembre de 1988, el Comité Asesor sometió a la consideración de este Tribunal y de la Conferencia Judicial un informe titulado *La independencia judicial en Puerto Rico.* El extenso documento contiene setenta (70) recomendaciones específicas proyectadas a corto, mediano y largo plazo. Su presidente, el Lcdo. Rubén Rodríguez Antongiorgi, describió certeramente así el alcance de esas recomendaciones en la sesión inaugural de la Conferencia Judicial:

A [c]*orto* [p]*lazo*: Eso es, medidas que pueden tomarse de inmediato, y que no requieren legislación. En este sentido se recomiendan dos *comités* apolíticos, uno a ser nombrado por el Gobernador para evaluar candidatos a nombramientos judiciales, y otro *comité* nombrado por este Hon. Tribunal Supremo para recomendar candidatos a la renominación y ascensos. Para que esas evaluaciones puedan ser confiables, recomendamos, como medida indispensable, procedimientos científicos de evaluación fundamentados en datos o información obtenida de acuerdo a la más moderna tecnología.

A *mediano plazo*: Recomendamos medidas que requieren acción legislativa, de las que las más importantes son revisión de los términos de los jueces. En este punto la mayoría del Comité recomienda nombramientos por vida. Algunos miembros recomiendan medidas intermedias. Recomendamos, de igual manera, la aprobación de proyectos sobre Autonomía Fiscal y Tesoro Propio, así como sobre la sede de los Tribunales.

A *largo plazo*: Que esperamos no sea tan largo, recomendamos reformas constitucionales:

El objetivo de una Judicatura de excelencia y de una auténtica independencia judicial sólo se logrará mediante una reforma del Artículo V de nuestra Constitución disponiendo como fundamentos básicos:

a) el concepto de inamovilidad de los Jueces, acompañado de procedimientos adecuados de evaluación;

b) creación de un Consejo Judicial parecido al que recomendó la Escuela de Administración Pública de la Universidad a la Asamblea Constituyente;

c) procesos de selección y renominación de Jueces sobre el concepto de mérito;

d) creación e implementación de la carrera judicial;

e) autonomía Fiscal para la Judicatura comparable a la que goza la Universidad de Puerto Rico.

El informe fue objeto de análisis detallado por innumerables miembros de la Conferencia Judicial. Todos los interesados tuvieron la oportunidad de exponer su posición sobre cada una de las recomendaciones. Imperó una comunicación franca y de altura sobre las relaciones entre los tres (3) poderes constitucionales del Estado Libre Asociado, animados por el deseo de fortalecer la Rama Judicial y afirmar su independencia sin confrontaciones innecesarias con las otras ramas del Gobierno, dentro del esquema político de separación de poderes, fundado en el sistema de pesos y contrapesos.

Concluida las deliberaciones de la Conferencia Judicial, según antes pautado, el Pleno de este Tribunal se reunió con el propósito de evaluar las recomendaciones del Comité Asesor, considerar los planteamientos vertidos y adoptar institucionalmente la resolución correspondiente. Celebramos una extensa reunión el sábado 8 de octubre de 1988. Tuvimos una discusión serena y franca sobre todas las recomendaciones del Comité Asesor. Luego de las deliberaciones de rigor, votamos sobre cada una de las recomendaciones. Posteriormente, fue redactada una resolución que recogía esos acuerdos.

El lunes 10 de octubre nos reunimos temprano en la mañana para examinar su texto final y se incorporaron algunos cambios de estilo. Esa tarde cumplimos con el compromiso contraído con la Conferencia Judicial de informar a los participantes el alcance de la resolución adoptada.

*Sistema de evaluación judicial*

En primer lugar, partimos de la premisa de que para fortalecer el principio de la independencia judicial era indispensable que se creara un sistema de mejoramiento y evaluación judicial dirigido por un comité autónomo nombrado por el Tribunal Supremo. En su informe, el Comité Asesor puso en su justa dimensión este aspecto del problema al concluir que "cualquier reclamo de mayor independencia judicial está inextricablemente atado al ejercicio riguroso de una fiscalización interna y externa, que abarque el mejoramiento del desempeño judicial, el aspecto disciplinario y el compromiso de rendir informes periódicos a la comunidad sobre la labor de la Judicatura". Informe de la Conferencia Judicial, San Juan, Secretariado de la Conferencia Judicial, octubre de 1988, pág. 81.

Dos (2) son los objetivos principales del comité que hemos endosado: el mejoramiento profesional de la Judicatura mediante el establecimiento de un sistema científico de evaluación y la obtención de información integral y confiable sobre la labor desplegada por los jueces que permita a la Rama Judicial emitir un juicio valorativo sobre las cualificaciones de sus miembros al momento de la renominación.

*Términos de nombramiento*

La segunda área examinada por la Conferencia Judicial fue el término de nombramiento de los jueces. Repetimos, el Tribunal por primera vez en su historia tomó una posición sobre este tema tan debatido desde la Convención Constituyente. Acordamos que la fijación por ley de términos de duración limitada en los cargos judiciales "no propicia el ideal de excelencia en el reclutamiento y retención de jueces y tiende a debilitar la independencia judicial". Bajo esa premisa concluimos que para realmente fortalecer la independencia judicial era y es menester el nombramiento inicial de

los jueces por un período inicial fijo y después uno sin término hasta su retiro y mientras observe buena conducta. "De ese modo proclamamos sin vacilaciones la insatisfacción que voces autorizadas del pasado y del presente han expuesto." Voto explicativo del Juez Asociado Señor Negrón García, pág. 457.

Las angustiosas experiencias recientes de la Rama Judicial con la sustitución del Juez Superior Hon. Guillermo Arbona Lago y el episodio análogo del Juez Superior Hon. Ramón Negrón Soto, requerían un pronunciamiento vertical de este Foro que atendiera las legítimas preocupaciones de los jueces y evitara su repetición. El drama, aún inconcluso, ha afectado la moral de la Rama Judicial.

Ante esos acuerdos, no compartimos la tesis del Juez Asociado Señor Rebollo López de que este pronunciamiento del Tribunal es "más de lo mismo". Todo lo contrario, nunca antes esta Curia se había manifestado tan claramente. Sin afanes de notoriedad, así respondimos a las realidades imperantes del país. Nos solidarizamos con la penosa experiencia de los ilustres compañeros que, a pesar de sus excelentes credenciales, no fueron ni han sido renominados por el Poder Ejecutivo en el ejercicio de su poder constitucional.

Por otro lado, con visión realista aceptamos que "[b]ajo el esquema constitucional de tres (3) poderes que rige nuestra sociedad, el juez desempeña una importante función como forjador de política pública. No se puede, por tal razón, cercenar el sistema democrático y desligar totalmente el proceso de selección de aquellos que le responden directamente al pueblo". Resolución, pág. 426. Lo contrario es ceder ante la ilusión e ignorar totalmente el desarrollo histórico constitucional de Puerto Rico y de Estados Unidos.

Es evidente que cualquier análisis sobre este asunto tiene que partir de la hipótesis de que las Ramas Ejecutiva y Legislativa son parte vital de cualquier proceso de selección. Lo verdaderamente importante es establecer los meca-

nismos que garanticen que todo el proceso —nombramiento y confirmación— esté fundamentado en los criterios de idoneidad de los candidatos. Para garantizar la perdurabilidad de esta medida, también acordamos que se elevara a rango constitucional.

En resumen, el nombramiento inicial por un período de duración limitado, unido a un sistema de mejoramiento y evaluación judicial, permitirá que los jueces que desempeñan responsablemente sus funciones puedan ser renominados para ejercer sus cargos por el resto de sus vidas sin los imponderables riesgos que genera el sistema actual.

*Nombramiento inicial de jueces*

Conscientes de los aspectos multidimensionales del tema tratado, nuestra resolución toma en cuenta la experiencia histórica del método de selección de jueces utilizado por los cinco (5) gobernadores electos que ha tenido Puerto Rico. Concluimos, sin reservas, que debía ser mejorado.

Al formular nuestra posición, no cedimos a la tentación natural de aprovechar la Conferencia Judicial para hacer reclamos de naturaleza gremial. Al utilizar el arma poderosa del intelecto y no la retórica destemplada, aceptamos que "[l]a determinación respecto a quién y cómo se seleccionan los jueces supone, entre otras, la decisión de hasta qué medida las fuerzas políticas prevalecientes habrán de participar en el proceso de selección" de los miembros de una rama que desempeña una función tan importante en ordenamiento constitucional. Resolución, pág. 426.

Con plena conciencia de los postulados de nuestro sistema constitucional de separación de poderes, reconocimos que la Judicatura desempeña una función importante como forjadora de política pública e intérprete de nuestra Constitución. Lo hicimos sin reclamos absolutos, pues convenimos con el Comité Asesor de que "la realidad es que la relación entre las ramas 'es en gran medida de orden dinámico', de

interpendencia, y como tal, despliega unos mecanismos de interrelación que garantizan armonía con el equilibrio constitucional que dicta este sistema". (Escolios omitidos.) Informe de la Conferencia Judicial, *supra*, pág. 10.

Al considerar los métodos de selección de jueces, no pudimos abstraernos de la enorme responsabilidad que recaía sobre nuestros hombros. No podíamos pedir total aislamiento y así "cercenar el sistema democrático y desligar totalmente el proceso de selección de aquellos que le responden directamente al pueblo". Resolución, pág. 426. Por tal razón, resolvimos que "[l]as ramas eminentemente políticas —Ejecutiva y Legislativa— son parte vital en cualquier proceso de selección". Íd.

Este principio de antigua estirpe y gran arraigo no es incompatible con el desarrollo de un sistema de selección de jueces fundamentado en la idoneidad y méritos de los aspirantes. Con estos propósitos y según sugerido por el Comité Asesor fue que recomendamos al actual Gobernador, Hon. Rafael Hernández Colón, que mediante Orden Ejecutiva designara un Comité Asesor de Nombramientos Judiciales Iniciales para evaluar los candidatos y recomendar los más idóneos.

Para asegurar la permanencia de este Comité Asesor de Nombramientos Judiciales Iniciales e imprimirle obligatoriedad a sus recomendaciones, propusimos su establecimiento inicialmente por vía legislativa y luego mediante enmienda constitucional. Ambas alternativas mantienen la autoridad nominadora del Primer Ejecutivo y la facultad de consejo y consentimiento del Senado.

*Autonomía presupuestaria*

Por último, el Tribunal también consideró la deseabilidad de que la Rama Judicial tenga una independencia en asuntos fiscales como presupuesto, administración de los asuntos de personal, control y custodia de los fondos asignados. Eva-

luadas las recomendaciones del Comité Asesor, endosamos totalmente la última parte de su informe. Por lo tanto, acordamos que se le reconozca a la Rama Judicial una autonomía presupuestaria real mediante un mecanismo de asignación automática con un porcentaje fijo (4%) del monto total de las rentas anuales ingresadas al fondo general. También propusimos que junto con la asignación automática se legislara para que tuviésemos custodia y control de los fondos asignados, así como la facultad de desarrollar un sistema de contabilidad independiente del Departamento de Hacienda.

## II.

De lo anterior se desprende que nuestra resolución propone cambios sustanciales en el ordenamiento vigente de carácter multidimensional dirigidos a fortalecer la independencia judicial en sus componentes esenciales: el proceso de selección, evaluación y retención de jueces, y los instrumentos fiscales y administrativos. Nuestra aportación, limitada por los parámetros constitucionales y éticos, representa un esfuerzo dirigido a examinar un problema fundamental de nuestro sistema de gobierno en su justa perspectiva. Propone medidas concretas que deben ser adoptadas por las tres (3) ramas del Gobierno si seriamente se desea mejorar las instituciones democráticas del país.

Estos planteamientos han sido expuestos en el plano de altura judicial y de respeto a que son acreedoras las otras ramas del Gobierno. Así evitamos que nuestros reclamos legítimos se pierdan en el fragor de la lucha electoral que culminará en las próximas semanas. A su vez, elevamos estos principios al nivel intelectual y reflexivo que caracteriza nuestras decisiones judiciales. Al así proceder tuvimos presente que en la actualidad tanto la Rama Ejecutiva como la Legislativa han iniciado una evaluación de los procesos de nominación y confirmación de los jueces, y expresado públi-

camente su interés en las deliberaciones y recomendaciones de la Conferencia Judicial.

En estas circunstancias el emplazamiento del Juez Asociado Señor Rebollo López a las otras ramas es a destiempo y contrario a los mejores intereses de la Judicatura. Los otros poderes no han tenido la oportunidad de atender nuestras propuestas. Aunque el vocablo *exigir* tiene entre sus acepciones la de "[p]edir *una cosa*", también significa "[d]emandar imperiosamente" o, en su forma adjetival, derivado de exigente, se refiere "en especial del que exige caprichosa o despóticamente". (Énfasis suplido.) *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, Vol. I, pág. 619. Hubiéramos preferido de su voto colegir la primera de las acepciones; no la adjetival.

Más allá de ese tenor, confesamos que nos ha sido difícil precisar las razones de su disenso. Salvo por el título, en realidad no existen tales desacuerdos. Su voto no expresa discrepancia alguna con la creación de un sistema de evaluación judicial, la deseabilidad de cambios en los términos de nombramiento de los jueces, el establecimiento del Comité Asesor de Nombramientos Judiciales Iniciales ni la deseabilidad de obtener autonomía fiscal y administrativa. Si alguna discrepancia existe, la detectamos en el estilo de su ponencia escrita y en la exposición pública desde la tribuna de la Conferencia Judicial. Las mismas esencialmente reflejan criterios distintos sobre las relaciones entre los poderes gubernamentales y, por consiguiente, sobre el método y lenguaje que debemos utilizar al promover cambios necesarios por vía legislativa o ejecutiva en asuntos controversiales, análogos o relacionados con polémicas político-partidistas.

Al refrendar la resolución del Tribunal y suscribir esta ponencia, hemos evitado críticas internas y externas que innecesariamente irritan no solamente las áreas naturales de conflicto en el Tribunal, sino también las existentes entre los

poderes públicos constitucionales. Obviamente, la efectividad de esos pronunciamientos desde el estrado no depende de la fogosidad ni de la retórica. El instrumento principal para defender los postulados de la Judicatura es la capacidad intelectual que individual y colectivamente tengamos para exponer nuestros criterios y convencer a los demás de la validez y razonabilidad de nuestros argumentos.

Por estas razones reiteramos nuestro voto de conformidad con la Resolución de 10 de octubre de 1988. Concluida nuestra tarea, corresponde ahora a las otras ramas de gobierno atender responsablemente nuestras inquietudes y recomendaciones.

*Epílogo*

A manera de epílogo, y luego de leer la otra ponencia suscrita por el Juez Asociado Señor Rebollo López, nuevamente consideramos de poco valor jurídico e institucional sus desmesuradas expresiones, especialmente cuando provienen del segundo Juez de mayor antigüedad en este Tribunal, de quien se espera un comportamiento más ejemplarizante. Por nuestra parte, y *anteponiendo los mejores intereses del Tribunal a cualquier consideración personal*, como siempre hemos hecho, no continuaremos con este debate. Hemos cumplido nuestra función de evaluar objetivamente esta resolución y no a otros miembros de los poderes gubernamentales del país.

—O—

Voto particular emitido por el Juez Asociado Señor Rebollo López.

San Juan, Puerto Rico, a 28 de octubre de 1988

El pasado 10 de octubre de 1988 —mediante el vehículo procesal apropiado de la opinión, emitida la misma en el foro

adecuado de la Sesión Especial sobre independencia judicial de la Conferencia Judicial— señalamos tres situaciones, imposibles de rebatir e indudablemente del conocimiento del Tribunal, que a nuestro juicio atentaban contra la independencia judicial, médula y garantía del sistema democrático de gobierno en que convivimos.

Como es ya de todos conocido, nos referimos a: (1) la acción de este Tribunal durante dos largos años de hacer caso omiso a una solicitud del Juez Superior Hon. Guillermo Arbona Lago de que se investigaran unas acciones del Lcdo. Héctor Rivera Cruz, Secretario de Justicia de Puerto Rico, acciones que el Juez Arbona Lago catalogó en la resolución que a esos efectos emitiera como que constituían "una impermisible amenaza de naturaleza chantajista"; (2) la acción del Hon. Rafael Hernández Colón, Gobernador de Puerto Rico, de no renominar al señor Arbona Lago para un nuevo término en la Judicatura, y (3) la acción de una de las Cámaras de nuestra Asamblea Legislativa de no aprobar legislación alguna, durante el período de un año, a favor de la Rama Judicial luego de dicho cuerpo legislativo ser objeto de una decisión adversa por parte de este Tribunal.

No hay duda de que la verdad al descubierto resulta mucho más dolorosa de aceptar. Por ello éramos conscientes en esos momentos, como lo somos en el presente, de que nuestros señalamientos no iban a ser del agrado de muchas personas, y que, por el contrario, corríamos el riesgo de ser víctimas de críticas injustas e infundadas y hasta de represalias. Ello no obstante, consideramos que el juramento que prestamos al tomar posesión del cargo que con tanto orgullo ocupamos, y el descargo responsable del mismo, nos imponían la obligación de así hacerlo.

*Emitimos la referida opinión disidente con el único propósito, y con la esperanza, de que el señalamiento público de dichas situaciones por parte nuestra tuviera el resultado*

*positivo y saludable de evitar que las mismas volvieran a
ocurrir en el futuro.*

I

*A diferencia de nuestros señalamientos del 10 de octubre
de 1988 —los cuales fueron de índole institucional— en el
día de hoy varios miembros de este Tribunal descargan su
frustración, producto la misma de la carencia absoluta de
argumentos válidos que oponer a nuestros señalamientos,
atacando al juez suscribiente en el plano personal.*

Dicha actitud, en adición a ser nociva a los mejores inte-
reses de esta Institución, resulta ser deprimente. Al no po-
der negar el hecho insólito e incomprensible de que este
Tribunal no atendiera y le diera curso a la querella que hace
dos años radicara el señor Juez Arbona Lago contra el Se-
cretario de Justicia; al no poder justificar su tolerancia ante
la actitud de inactividad del Senado respecto a los proyectos
radicados en beneficio de la Rama Judicial, y conscientes del
hecho de que mal pueden empuñar y enarbolar la bandera de
la independencia judicial aquellos que públicamente expre-
san una cosa pero que por su acción, u omisión, hacen otra,
lamentablemente recurren a la injuria y al insulto personal.
Al así hacerlo *descienden vertiginosamente* del plano de "al-
tura judicial y respeto" desde el cual alegadamente ellos ha-
cen sus planteamientos.

En específico, uno de los integrantes de este Tribunal —
el Lcdo. Federico Hernández Denton— se hace eco de unas
infundadas e irresponsables manifestaciones públicas a los
efectos de que nuestros señalamientos del 10 de octubre de
1988 tenían motivaciones políticas; manifestaciones que re-
sultan, cuando menos, ridículas cuando se consideran los
largos años de servicio que en distintas capacidades hemos

prestado al Pueblo de Puerto Rico, designados para ello por diferentes gobernadores.(1)

La verdadera ironía de todo este innecesario y enojoso asunto —*el cual no beneficia a persona alguna y, por el contrario, le hace un gran daño a esta Institución*— radica en el hecho de que la imputación sobre motivaciones políticas se le hace a uno de los pocos miembros del Tribunal que nunca ha tenido ataduras y conexiones políticas estrechas con partido o líder político alguno; conexiones y ataduras que históricamente han sido parte integral innegable del bagaje personal y profesional de muchas de las personas que en un momento u otro han formado parte de este Tribunal.

*Lamentablemente para el bienestar de nuestro País, parece ser la "orden del día" que cuando un funcionario público —en el descargo responsable del puesto que desempeña— realiza o expresa algo que desafortunadamente resulta ser contrario a los intereses de un líder o partido político, dicho funcionario inmediatamente es víctima o blanco de unas concertadas, cobardes e irresponsables imputaciones.*

## II

Las expresiones a los efectos de que nuestros señalamientos del 10 de octubre de 1988 lastiman la dignidad de los seres humanos y de que las mismas constituyen un "flaco servicio" a la democracia puertorriqueña son prueba incues-

---

(1) En 1966, designado Fiscal Auxiliar del Departamento de Justicia por el Hon. Roberto Sánchez Vilella.

En 1973, nombrado Juez del Tribunal Superior de Puerto Rico por el Hon. Rafael Hernández Colón.

En 1982, designado Juez Asociado del Tribunal Supremo de Puerto Rico por el Hon. Carlos Romero Barceló.

Es con gran satisfacción que señalamos que somos el único juez de este Tribunal que fuera confirmado por el Senado de Puerto Rico en la situación en que el partido político de la mayoría parlamentaria no correspondía al partido del poder nominador.

tionable de la confusión mental en que se desenvuelven algunas personas.

No hay duda que nuestra Constitución establece que la dignidad de los seres humanos es inviolable. *La dignidad del ser humano y la dignidad de la Rama Judicial puertorriqueña es precisamente lo que estaba en juego en las tres situaciones objeto de nuestros señalamientos del 10 de octubre de 1988.* Lamentablemente para el sistema de justicia en Puerto Rico y el buen nombre de este Tribunal, una Mayoría de sus integrantes, en esas tres instancias, no entendió necesario defender esa dignidad. Confundido totalmente está el miembro de este Tribunal que al señalársele su omisión, acomodaticiamente entiende que se le está violando *su* dignidad.

*Por otro lado, somos del criterio que si algún efecto positivo van a tener nuestros señalamientos y reclamos lo es el de fortalecer la democracia puertorriqueña. Una Rama Judicial independiente de criterio, valerosa y autosuficiente es requisito indispensable de toda democracia.* La Rama Judicial tiene la obligación de darse a respetar. Ello no se logra solicitando y suplicando que se le conceda aquello a que tiene derecho. Tampoco si uno sólo de sus miembros es el que libra la batalla. Lo acontecido en las últimas tres décadas en nuestro País es prueba fehaciente y suficiente de que las otras dos ramas del Gobierno han hecho caso omiso de nuestros justos reclamos. No cumplimos con nuestra obligación de hacer respetar y defender la Rama Judicial mediante el uso de retórica rebuscada, promesas que nunca se cumplen, y con patéticos intentos de congraciarse con otras personas.

Ha llegado la hora, repetimos, de exigir los derechos que nos corresponden bajo nuestro sistema democrático de gobierno. Para ello se requiere *la acción conjunta y valiente* de toda la Rama Judicial, en especial la de este Tribunal.

## III

Por último, deseamos hacer claro que —no obstante las críticas injustas y las represalias de que podamos ser objeto— el juramento que prestamos al tomar posesión de nuestro cargo, nuestra consciencia y la vocación judicial que late en la misma, impedirán que permanezcamos callados en el futuro si alguna de esas situaciones, o cualquiera otra que constituya un atentado contra esa independencia judicial, vuelve a repetirse o a ocurrir.